REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1129

September Term, 2012

JOSHUA GABRIEL PRINCE

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Wright,
Nazarian,

JJ.

Opinion by Nazarian, J.

Filed: February 26, 2014

> I shot an arrow into the air,
> It fell to earth, I knew not where . . .
>
> Henry Wadsworth Longfellow, *The Arrow and the Song*[1]

In this appeal, we have not an arrow but a "trajectory rod," which a police officer used to show the path a bullet took when the appellant, Joshua Prince, fired a rifle from above at his ex-girlfriend as she cowered behind the rear bumper of her car in a parking garage. Mr. Prince was charged with attempted murder and other charges, tried before a jury in the Circuit Court for Montgomery County, and convicted. On appeal, he challenges the circuit court's decision to allow the State to introduce the testimony about the rifle's firing pattern and the bullet's trajectory through the roof and interior of her car. He also contends that the trial court improperly denied his counsel's request for a continuance to allow him to develop expert testimony regarding his mental state. We affirm.

## I. BACKGROUND

Mr. Prince moved into the Bethesda apartment complex of his then-girlfriend, Allanna Garbe on August 28, 2010. Ms. Garbe had discouraged the move; she felt their relationship should move more slowly, but he apparently saw things differently and took an apartment one floor up from hers in the same building. The transition went badly and, as we shall see, spiraled quickly from there: Mr. Prince felt "disappointed and upset" when Ms. Garbe did not help him move in, and Ms. Garbe expressed discomfort at how quickly he viewed the relationship as progressing. On the evening of September 1, 2010, she went to his apartment

---

[1] Longfellow, *The Arrow and the Song* (1845), *reprinted in* John Bartlett, Bartlett's Familiar Quotations 436 (18th ed. 2012).

and, in a conversation that lasted thirty to forty minutes and that she later characterized as "peaceful," she told him that she no longer wanted to be in a relationship.

A few nights later, on September 3, 2010, Mr. Prince saw Ms. Garbe leave her apartment with a male friend. He sent her a series of text messages beginning around 10:00 p.m. asking what she was doing and telling her that he loved her. His behavior escalated from there: he showed up at Ms. Garbe's apartment within moments after she and her friend returned to her apartment (around midnight), and when she came out to speak with him, he seemed not to understand that she had broken up with him, then remained in the hallway twenty minutes after their conversation ended. Ms. Garbe felt uncomfortable and afraid, so her friend remained in her apartment with her through the night. Mr. Prince continued to send text messages that night and through the morning, finally culminating in a 4:46 a.m. text in which he stated, "You told me you loved me and hoped we could get married one day. You brought another man in your bed tonight. How could you live with yourself?" Mr. Prince also had a conversation in the parking garage in the early morning hours with two other residents of the complex (whom he had never met), telling them in depth about the relationship and his dismay that Ms. Garbe chose to end it.

The next morning, Ms. Garbe discovered that someone had vandalized her car during the night. The doors, trunk, roof, and hood of the car were dented and both the side mirrors had been ripped off. On the recommendation of police officers who responded to her call, she obtained a no-contact order against Mr. Prince that same day. When Mr. Prince learned

2

about the order, he asked Ms. Garbe by text to withdraw it. He said he did not believe that she had no other romantic interest, and he continued texting her throughout the evening.[2] For the remainder of Labor Day weekend, September 5 and 6, though, the two did not communicate.

Sometime between 7:00 and 7:30 a.m. Tuesday morning, September 7, Ms. Garbe went to her car, which was parked on the third floor of the parking garage. She climbed in the driver's side, but before closing the door she sensed movement, looked up, and saw Mr. Prince on a ramp between the third and fourth floors of the garage, where he "had just stooped down and had a rifle pointed at me."[3] When asked to describe the rifle, she explained it was "[j]ust a very large gun that he had over one shoulder *directly pointed at me*." (Emphasis added.) Ms. Garbe scrambled out of the car and hid behind the rear bumper. The two or three times she looked up, she "saw [Mr. Prince] with the gun just pointed directly at [her], taking full aim at [her]."

After she heard a gunshot, Ms. Garbe looked again and saw that Mr. Prince was no longer aiming at her, so she ran into the apartment building and called 911. Minutes later, she received a new series of texts from Mr. Prince:

---

[2] Mr. Prince sent texts sporadically, but in groups that would appear rapidly in a series. The messages varied in tone from matter-of-fact to highly emotional.

[3] From her testimony it appears that the higher ramp, where Mr. Prince stood, sat a half-floor higher than the level on which Ms. Garbe was parked, so he could not have turned the corner on foot to get to her car even though he was only a short distance away. An investigating officer measured the distance and testified that Mr. Prince was crouched seven to eight feet away from the driver's seat of Ms. Garbe's vehicle.

3

- "I never would have hurt you honestly";

- "I pictured my life without you and you with another man and I snapped";

- "I know I can't take this back"; and

- "I know I just threw away my life."

Ms. Garbe responded (having been told by the police to do so), and encouraged Mr. Prince to turn himself in, which he did. An investigation of the fourth-floor ramp in the garage uncovered a garment bag, a live round of ammunition, and a cartridge casing. Police also searched Mr. Prince's apartment and found an open rifle case by his bedside. Moreover, after hearing a recorded conversation between Mr. Prince (incarcerated at the time) and a friend, police interviewed the friend, who produced a box of ammunition that Mr. Prince had asked him to hide and from which three rounds were missing.

The State charged Mr. Prince with attempted first-degree murder, first-degree assault, carrying a dangerous weapon with intent to injure, and failing to comply with a peace order. He underwent a mental health evaluation at Clifton T. Perkins Hospital Center by psychologist Inna Toller. In January 2011, Dr. Toller rendered a report in which she found him competent to stand trial and criminally responsible. Although she acknowledged that Mr. Prince suffered from post-traumatic stress disorder ("PTSD") from his military experience in Iraq as a medic, Dr. Toller concluded that it played no role in his conduct: "[T]here is no evidence that [his PTSD] symptoms caused him to have significant impairment in every day function." She opined, based on how Mr. Prince acted on the morning of the incident, that

4

"the PTSD and the adjustment disorder did not cause him to lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

Trial was scheduled to begin on Monday, March 26, 2012. On the afternoon of Friday, March 23, 2012, Mr. Prince moved for a continuance. He argued that he had obtained a preliminary report from a psychologist, Rona Fields, Ph.D. (the "Fields Report"), in which, he said, she opined that Mr. Prince "*most likely* suffered" from PTSD at the time of the incident (emphasis added).[4] According to the motion, Mr. Prince had only recently been able to gather funds for Dr. Fields's preliminary evaluation and she needed more time to complete testing and determine whether he might suffer organic brain damage or whether his PTSD contributed to the incident. The State opposed the motion, citing the facts that the incident had taken place over a year and a half earlier, that there had already been an aborted plea deal, that the case had been continued twice already, and that Ms. Garbe objected strongly (even at the time of trial, Mr. Prince apparently still was attempting to contact her).

The trial court denied the motion on the morning of trial, explaining (over five pages of transcript) that Dr. Toller had reviewed all the relevant history and documents, and had concluded Mr. Prince's mental health issue had nothing to do with the events in question:

> the PTSD and the adjustment order did not cause him to lack
> substantial capacity either to appreciate the criminality of his

---

[4] As we discuss below, the Fields Report does not, on closer examination, express that opinion to a reasonable degree of medical certainty.

5

conduct or to conform his conduct to the requirements of the law. Therefore, to a reasonable degree of medical certainty, Prince was found [by Dr. Toller] to be criminally responsible.

The court noted that Dr. Toller believed Mr. Prince "had a clear secondary gain to avoid incarceration and be found not criminally responsible," and, as a result, had diagnosed him with malingering. For these reasons, the court found no good cause to continue the trial and it went forward as scheduled.

The State presented seven witnesses in its case-in-chief, beginning with Ms. Garbe and including two police officers whose testimony Mr. Prince challenges here. Detective Brian Stafford, who responded to the 911 call, interviewed Ms. Garbe, videotaped the scene, and documented the area where Mr. Prince stood at the time of the shooting. Officer Ryan Costello examined Ms. Garbe's car after it was brought in to police for processing and, as part of his examination, placed "trajectory rods" through the bullet holes in the car and photographed the rods in place.[5]

Neither Officer Costello nor Detective Stafford was offered or qualified as an expert witness. The State had notified counsel for Mr. Prince two weeks before trial that it planned to call expert witnesses "in crime scene and trajectory" (Officer Costello) and "in weapons and ballistics" (Detective Stafford), but counsel for Mr. Prince moved *in limine* to preclude

---

[5] The remaining witnesses included the law enforcement officers who served the peace order on Mr. Prince, responded to Ms. Garbe's 911 call, and executed the search warrant in Mr. Prince's apartment, and the resident at the apartment complex who spoke to Mr. Prince in the early morning hours of September 4.

6

the testimony based on the State's lack of formal or timely notice of the experts. At a hearing on the morning of trial, the State informed the court that it had intended to call Officer Costello as an expert, but had changed its mind: "[i]n reality, his testimony is really factual, so we have no problem . . . we don't need to qualify him as an expert, so we won't." In response, counsel for Mr. Prince acknowledged voluntarily that his motion was moot. The parties did not discuss Detective Stafford's testimony at that point (the whole colloquy occupies less than a page of transcript), either by naming him or by talking generically about any ballistics testimony.

When the time came for Detective Stafford to testify, he offered a detailed account—without objection from Mr. Prince's counsel—about the live round found on the scene:

> Q. And could you please describe what type of ammunition that is?
>
> A. It's a 7.62 NATO full metal jacket round, standard military loading.
>
> Q. *You say that like we should all know.* Give us the numbers that you first said?
>
> A. 7.62 NATO.
>
> Q. *What does that mean?* What is the 7.62?
>
> A. The 7.62 refers to the diameter of the bullet.
>
> Q. Okay.

A.    It's basically a 30 caliber bullet. NATO, it refers to the North Atlantic Treaty Organization. In the 1950s, NATO wanted to come up with a common round for all the member countries to use. This is the ammunition they standardized, largely because the United States insisted on a 30 caliber cartridge.

Q    Okay. *And what is the significance of the markings on here?*

A.    These are what are called head stamp markings. They're on the head of the case. This one says NATO on it. There is a letter on there, F, and then there's a number, which is 81. 81 would be for the year of manufacture, the year that this ammunition was manufactured.

Q.    So in 1981?

A.    Yes. And the F would identify the armory or the factory where it was made.

Q.    Okay, anything . . . that you note of significance on [Exhibit] 32?

A.    Well, this doesn't have a firing pin.

Q.    Oh, I'm sorry.

A.    This has a primer, which is struck by the firing pin when you fire the round.

Q.    Okay, and *is there anything of significance* that would indicate how this bullet came to be ejected from a rifle?

A.    There is. There's a small dimple or marking in the middle of the primer. It's consistent with where the firing pin would have struck the primer in order to fire the round. It's not very deep. It's really just a superficial mark, but *it indicates to me that it was most likely a misfire.*

8

Q.     Okay. What's this green stuff[6] that we're seeing?

A.     On there?  Sometimes the—

[Counsel for Mr. Prince]: I would object, Your Honor. Can we approach?

THE COURT: Sure.

(Bench conference follows:)

[Counsel for Mr. Prince]: Your Honor, *I would note an objection*. It seems apparent that [the State] is qualifying Mr. Stafford as an expert in this case. She's asking for him to draw conclusions. I don't know what his testimony is to proffer or what evidence was recovered from the scene. But *at this point*, she's asking questions outside of what I believe are expert boundaries in regards to ammunition and markings as such on the bullets.

[Counsel for the State]: Your Honor, it's all contained within the police report. The types of ammunition, how the ammunition is observed to be—

*  *  *

[Counsel for the State]: We'll move on, but we feel it's relevant.

(Emphases added.) Later in his testimony, Detective Stafford revisited the live round:

[Counsel for the State]: Okay. Detective Stafford, very briefly, *what does a misfire mean?*

---

[6] The State explained the reference to "green stuff" in its brief: "Subsequent testimony established that a plastic-wrapped green box of ammunition was in [Mr.] Prince's apartment. The cartridges bore the same head stamp as the live round at the scene and the cartridges also had some green discoloration on them, as did the live round at the scene."

9

A. *It means you pull the trigger and a round doesn't go off.* It could be attributable to a number of things, either the primer that's in the base of the cartridge might be bad and just doesn't go off. It can also be [attributed] to a malfunction of the firearm. Sometimes if you've got like a dirty firing pin channel, the firing pin will come forward far enough to actually strike—

[Counsel for Mr. Prince]: Objection, Your Honor.

THE COURT: Same basis?

[Counsel for Mr. Prince]: Same basis, Your Honor.

THE COURT: Overruled.

(Emphasis added.) Detective Stafford went on to provide further detail regarding the officers' investigation of the scene.

Before Officer Costello testified, counsel for Mr. Prince objected to admission of the photographs of Ms. Garbe's car that showed the trajectory rods the officer had placed in the bullet holes. According to his counsel, "the trajectory is all speculation in terms of the path of the bullet and whatnot." Counsel for the State responded that the testimony was *not* expert testimony, and specifically that Officer Costello would testify only to fact information about the rods' placement:

what these yellow rods are and what they're used for. And that they placed them to follow the path that the bullet took through the car. And that it ended, went through the bumper here and ended on that metal place.

And again, he's not testifying as an expert.

10

The Court ultimately determined that the placement of the rods was not a subject of expert testimony, and clarified the universe of appropriate testimony from Officer Costello:

> THE COURT: But this doesn't require expert testimony. The testimony will be that they looked at the car. That there was a hole in the roof. That they put these rods through the hole. That it came out inside the car. There was a hole in the back seat. They put the rod through that. It went all the way through.
>
> The testimony will be that they didn't make these holes. They didn't drill them in there.
>
> * * *
>
> THE COURT: But you have to stay away from . . . any sort of technical language as regards to . . . trajectory and that sort of thing.
>
> * * *
>
> THE COURT: Now, counsel [for Mr. Prince], for the record *you obviously need to make your objection at the point that they are offered*.
>
> [Counsel for Mr. Prince]: Yes, Your Honor.
>
> THE COURT: But I will overrule the objection.
>
> [Counsel for Mr. Prince]: Yes, Your Honor.
>
> THE COURT: *But you need to make a good record.*

(Emphasis added; omitting interjections from State's counsel.)

Officer Costello testified that he examined Ms. Garbe's car at the vehicle processing facility and performed a "reconstruction" analysis, explaining—again without objection from Mr. Prince's counsel—what that meant:

11

A.    Meaning basically I wanted to or attempted to show trajectory or the path that was taken by a suspected bullet through the vehicle.

Q.    And do you use any tools to do that?

A.    Yes, trajectory rods.

Q.    What is that?

A.    So they're basically just standard rods that you kind of place through holes or in this case suspected bullet holes to show the directionality of travel, the path of travel.

Q.    I'm going to show you what's been marked as State's [Exhibits, the photographs]. Can you identify those?

A.    Yes, I can.

Q.    And what are they?

A.    Those are photographs that I took on that day.

Q     Generally, what are they of?

A.    Of the trajectory rods that I spoke of, just now.

Q.    And the trajectory rods that are in those photographs, did you place them where they are in those pictures?

A.    I did. Yes.

After the State moved the photographs into evidence, counsel for Mr. Prince objected *for the first time*. The court overruled his objection and Officer Costello proceeded to explain how he placed each trajectory rod through a suspected bullet hole—first through the roof of the car, next through the driver's headrest, next through the rear seat on the driver's side, and

12

finally through the rear of the trunk and the interior bumper of the vehicle. Again, this testimony came in without objection from counsel for Mr. Prince *until* the State sought to move the *photograph*s into evidence.

After the close of the State's case, Mr. Prince moved for a judgment of acquittal that the court denied. He then rested without testifying or putting on any evidence. The jury convicted Mr. Prince of all charges, and after a sentence review hearing, the court imposed a sentence of life with all but 25 years suspended on the conviction for attempted first-degree murder, and concurrent sentences on the remaining counts. He was committed to Patuxent Institute, ordered to serve five years of supervised probation on release, and was to have no contact with Ms. Garbe. He filed a timely appeal.

## II. DISCUSSION

Mr. Prince argues on appeal that the trial court should not have permitted Detective Stafford and Officer Costello to testify as lay witnesses regarding information that was properly the subject of expert testimony.[7] We take each officer's testimony in turn, but before

---

[7] He phrases the questions presented as follows:

> 1. Did the trial court clearly abuse its discretion when it allowed Detective Brian Stafford, a lay witness, to testify that a live round found at the scene had misfired?
>
> 2. Did the trial court clearly abuse its discretion when it allowed Officer Ryan Costello, a lay witness, to testify about the alleged trajectory and termination point of the bullet through the car?

(continued...)

13

reaching that question, we address as to each the State's argument (with which we agree) that Mr. Prince's counsel failed to lodge timely objections to the testimony. As to Mr. Prince's *second* claim, that he was entitled to a continuance, we conclude that because one expert had already determined he was competent to stand trial, and in light of the timing of his request, the trial court properly exercised its discretion not to allow him another opportunity, literally on the eve of trial, to try to rebut that finding.

### A. The Trial Court Properly Admitted The Testimony Of Detective Stafford And Officer Costello.

We start by clarifying the issues the two law enforcement witnesses have in common and how they differ. Mr. Prince claims that both officers inappropriately testified as experts, and that the "cumulative prejudicial effect" of their testimony requires reversal. A close reading of the transcript and the parties' briefs reveals, though, that the State *really* isn't contesting the characterization of Detective Stafford's testimony as expert testimony and that Officer Costello didn't offer expert testimony at all. And in any event, we agree with the State that these objections were not preserved as to *either* witness.

---

[7](...continued)

3. Were the errors in admitting Detective Stafford's and Officer Costello's testimonies prejudicial and not harmless?

4. Did the trial court clearly abuse its discretion when it denied Defense Counsel's motion for a continuance to secure critical evidence regarding Mr. Prince's mental state?

### 1. Detective Stafford

Mr. Prince argues that Detective Stafford's testimony about the alleged misfire was expert testimony and "should not have been admitted over [d]efense [c]ounsel's objections." According to Mr. Prince, these objections were "repeated" throughout the State's direct and redirect examinations of Detective Stafford. The State views the transcript differently, arguing that Mr. Prince did not preserve the question of its admission for review given the timing of his objections and, to the extent he did, its admission was harmless.

We assume without deciding that the testimony constituted expert testimony, but we agree with the State that Mr. Prince failed to object to the testimony in a timely manner at trial, and therefore failed to preserve these arguments. Moreover, the evidence showed not just the misfire but that Mr. Prince affirmatively fired a second bullet which, combined with Ms. Garbe's testimony that Mr. Prince took aim directly at her and the remaining evidence the State introduced at trial, rendered harmless the admission of any testimony relating to the misfire.

*First*, Mr. Prince's characterization of his counsel's objections does not square with the trial transcript. Although counsel did object on occasion, the objections were sufficiently delayed that they did not preserve his objections regarding the expert (or not) character of Detective Stafford's testimony. Maryland Rule 4-323(a) states that "[a]n objection to the admission of evidence shall be made *at the time the evidence is offered* or as soon thereafter as the grounds for objection become apparent." (Emphasis added.) We agree with Mr. Prince

that there is no bright-line rule to determine when an objection should be made. *See Holmes v. State*, 63 Md. App. 159, 164 (1985). But the objection must come quickly enough to allow the trial court to prevent mistakes or cure them in real time:

> The requirement of a *contemporaneous objection* is a necessary and salutary one, designed to assure both fairness and efficiency in the conduct of trials. A party cannot be permitted to sit back and allow the opposing party to establish its case, or any part of its case, through unchallenged evidence and then, when it may be too late for the opposing party to recover, to seek to strike the evidence. The "sporting theory" of trial does not go that far.

*Perry v. State*, 357 Md. 37, 77 (1999) (emphasis added).

Here, counsel did "sit back" until it was too late. When Detective Stafford was called to testify, counsel let things go on for quite some time before he lodged any objections relating to the expert character of the testimony. He did not object when the State first called the detective to the stand, throughout the entirety of his qualifications (including his familiarity with firearms), or during his testimony about the investigation of this incident until after the State's question about the "green stuff." By then, Detective Stafford was well into and then *well past* his testimony relating to the misfire, and the objection came too late to preserve the issue for appeal.

Indeed, counsel for the State even signaled, wittingly or not, that the detective's testimony could require greater than a layperson's knowledge. After he described the ammunition as a "7.62 NATO full metal jacket round, standard military loading," counsel stated "*You say that like we all know*." (Emphasis added.) Detective Stafford responded

16

with further detail about the markings and explained that the "dimple" in the middle of the primer indicated a misfire. Mr. Prince's counsel objected only *after* the State had moved on to ask about the green discoloration on the live round, and even then objected only to the pending question about the "green stuff."[8] At that time the court neither sustained nor overruled the objection, and the State simply "moved on." Counsel for Mr. Prince did not ask for any curative instruction or a ruling on the admission of Detective Stafford's testimony. And when counsel objected several pages later to Detective Stafford's testimony about the misfire (and then in the course of his answer, not when the State asked the question, "what does a misfire mean"), that area had already been covered and admitted on direct. By then, the claimed "damage" had already been done—that is, the State's question about the misfire simply repeated a question that had already been asked and answered without objection, rendering the testimony cumulative in either event. *Dove v. State*, 415 Md. 727, 743-44 (2010) ("[C]umulative evidence tends to prove the same point as other evidence presented during the trial").

Counsel did not follow the requirements of Rule 4-323 or the rationale behind *Perry* by waiting until the misfire was out of the bag, so to speak. The timing of his objections also undercuts Mr. Prince's argument that the State thwarted one purpose of discovery—"to avoid

---

[8] Although Mr. Prince reads the objection at this point in the trial broadly to cover *all* of Detective Stafford's prior testimony, we disagree. In hindsight, it may appear to refer back to testimony about the misfire, but the trial court did not err in interpreting the objection at the time to pertain only to the "green stuff" about which the detective had just been asked.

surprise at trial and to give the defendant sufficient time to prepare a defense." *Hutchinson*

*v. State*, 406 Md. 219, 227 (2008). Although counsel argued in passing in his written Motion

*in Limine* that he had been deprived of the opportunity to get experts in opposition to the

State's ("Counsel for [Mr. Prince] has looked into obtaining an expert in ballistics . . . but has

not been able to do so due to the late notice."), his counsel made *no* such argument at the

hearing. Instead, he withdrew his categorical objection to Officer Costello's testimony as

moot and failed to press the court for a ruling as to Detective Stafford.

*Second*, even if we were to conclude that the court erred in overruling the belated

objection, the error was harmless. This case stands in stark contrast to *Ragland v. State*, 385

Md. 706 (2005), in which the trial court allowed police officers to testify as lay witnesses

about their conclusions that the defendant was engaged in a drug deal.[9] The Court of Appeals

concluded that the trial court's error was not harmless because the State had relied heavily

on the officers' testimony and the remainder of the case was correspondingly weak:

> The primary witness against Ragland was . . . an impeached
> witness, a participant in the alleged crime, and a witness
> testifying pursuant to a plea agreement with a promised benefit
> from the State. The remaining evidence was circumstantial, and
> depended upon an inference that [that witness] had obtained his
> piece of crack cocaine from [Ragland]. To support this
> inference, the State relied in large part on the police officers'
> opinion testimony that the events [in question] had constituted
> a drug transaction. Under these circumstances, we cannot say

---

[9] We discuss *Ragland* again below with regard to whether Officer Costello's testimony should be treated as expert or lay witness testimony.

> beyond a reasonable doubt that this testimony did not contribute
> to the verdict.

*Id.* at 726-27.

Here, we find beyond a reasonable doubt that this testimony could not have influenced the jury's verdict. *See Dionas v. State*, 436 Md. 97, 108 (2013) (noting that "[b]ecause a criminal conviction must be based upon proof beyond a reasonable doubt in order to satisfy the constitutional requirements of due process, 'an appellate court should not arrive at a conclusion about the impact of an error upon a jury verdict with any less degree of certainty'" (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976))). The State introduced abundant evidence that Mr. Prince acted with the intent to kill Ms. Garbe. He sent numerous texts to Ms. Garbe in the time preceding the incident that showed his escalating emotional state. He vandalized her car, showing a propensity to violence. Physical evidence in his room reflected that he planned the attack ahead of time. And—most damning of all—the misfire was not the shot that counted or that established Mr. Prince's intent. Ms. Garbe specifically testified that she saw Mr. Prince *aiming right at her* as the next bullet went into and through her car, intentional conduct that by itself qualified as behavior that could support a conviction for attempted first-degree murder. *Compare People v. Lamprey*, 398 N.E.2d 1076, 1079-80 (Ill. App. 1979) (permitting a conviction for attempted murder to stand in the face of evidence of two misfires alone, without the firing of an actual shot). In this case, Mr. Prince did not shoot blindly in the air or even fire a warning shot. With or without any misfire, the undisputed evidence at trial established that he crouched *seven to eight feet from his victim,*

19

aimed the rifle directly at her, and fired a shot directly into her car. We are comfortable that, in light of the totality of the evidence presented (and not presented) at trial, the testimony about the misfire could not have affected the jury's decision to convict.

### 2. Officer Costello

Mr. Prince challenges the admission of Officer Costello's testimony about the trajectory rods, again, he says, "[o]ver [d]efense [c]ounsel's repeated objections." He claims that Officer Costello gave expert testimony that was self-contradictory and confused the jury, rather than assisting it, and that the error was not harmless.[10] As above, we begin by addressing the State's argument that Mr. Prince failed to preserve his objections, and again we find that he did not preserve them, even after the court specifically reminded him to make any objections when the testimony was offered. We also hold that the court properly admitted Officer Costello's testimony as that of a lay witness.

*First*, as to the timing of Mr. Prince's objections, counsel engaged in a lengthy colloquy with the trial court in which the court ultimately held that Officer Costello could testify as a lay witness—this after counsel for Mr. Prince *withdrew* the Motion *in Limine* as moot at the hearing the morning of trial. The court made clear to the State that it could not

---

[10] Although he also seems to suggest that the State's counsel improperly argued in closing that Ms. Garbe was seated in the front of the car when Mr. Prince fired the weapon, he did not raise this point on appeal with specificity and we decline to address it here. Md. Rule 8-131(a); *Jones v. State*, 379 Md. 704, 715 (2004) (appellate court may exercise its discretion in determining whether to hear unpreserved legal arguments); *Rollins v. Capital Plaza Assocs., L.P.*, 181 Md. App. 188, 202 (2008) (dismissing appeal where, among other failings, appellant raised arguments unsupported by any legal authority).

get into "technical language" or opinions regarding the bullet's trajectory. The court then warned counsel for Mr. Prince, "you need to make a good record."

Officer Costello then testified at length about his reconstruction with *no* objection from Mr. Prince's counsel. He explained his process for placing the trajectory rods and where each rod appeared in the car, drawing objections from counsel only later, when the State attempted to move the photographs into evidence. This objection, seemingly only to the photographs in any event, failed to heed the court's prior admonition that counsel make the appropriate objection when the testimony was offered.

*Second*, even though it wasn't preserved, we feel compelled to address the question Mr. Prince presses on appeal, *i.e.*, whether the trial court improperly permitted Officer Costello to testify as a lay witness. We review that decision for an abuse of discretion: the decision as to whether to require a witness to testify as an expert "'is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.'" *Oken v. State,* 327 Md. 628, 659 (1992) (quoting *Stebbing v. State,* 299 Md. 331, 350 (1984)); *Whittington v. State*, 147 Md. App. 496, 539 (2002). Maryland Rule 5-701 governs admissibility of lay witness testimony:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

21

Md. Rule 5-701. Expert testimony, on the other hand, is governed by Rule 5-702, which lists specific factors that the trial court must examine in order to determine its admissibility:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Md. Rule 5-702.

In *Ragland*, the Court of Appeals reviewed both these rules under the then-existing standard and concluded it was appropriate to prohibit admission as "lay opinion" testimony that is based on "specialized knowledge, skill, experience, training or education." 385 Md. at 725. The officers had testified at trial that they observed the defendant engaging in what they believed to be a drug transaction. *Id.* at 709-10. One of the officers testified that "in his opinion" he saw a drug transaction taking place; the State, while claiming he was not testifying as an expert, explained that the officer brought "special knowledge about drug deals" to the table. *Id.* at 726. The officer himself stated that his opinion was "based" in part on his prior experience in a narcotics unit and his involvement in over 200 drug arrests. *Id*. The Court recognized that "[t]he connection between the officers' training and experience on the one hand, and their opinions on the other, was made explicit by the prosecutor's questioning," and the reliance on the officer's expertise meant that his testimony was improperly admitted as lay testimony. *Id*.

22

The witness in *Ragland* presented testimony that indisputably was grounded in his expert knowledge and experience—he relied specifically on his training to determine the drug transaction was taking place and interpreted the incident *subjectively* as he saw it unfold. As the Court described the facts, it was dark, none of the officers could see the face of the defendant or the items the parties exchanged, *id.* at 709-10, and the officers were required to base their conclusions on their training and experience in light of the "numerous possible explanations for the events" of that evening. *Id.* at 726; *see also People v. Stewart*, 55 P.3d 107 (Colo. 2002) (*en banc*). So too in *Stewart*, in which the Supreme Court of Colorado held that an officer's testimony constituted expert testimony when he testified to an accident reconstruction that he performed based on witness testimony, and in which he interpreted skid marks at the scene. 55 P.3d at 122. Although the officer's testimony about his *observations* of the crime scene and his investigation of the incident were *proper* areas of lay testimony, the Court held that "it was *inappropriate* for the court to permit him to testify as a lay person about his *reconstruction* of the crime scene and his *deductions* about such matters as the vehicle's direction, position, and speed." *Id.* at 124 (emphasis added). This case is different—as we discuss below, the process of sliding trajectory rods through existing bullet holes, taking photos of the result, and reporting his actions does not require expertise or analysis grounded on an officer's particular training or experience.

We also are not persuaded by *State v. Walters*, 551 A.2d 15 (R.I. 1988),  or by the other cases Mr. Prince cites for the proposition that trajectory analysis can *only* be the subject

23

of expert testimony. In *Walters*, the Supreme Court of Rhode Island held that a police officer could not properly testify about the "trajectory check" he performed on the victim's car that, according to the prosecution, went to show that the defendant had assumed a "combat position" directly in front of the vehicle as he shot at the victim. *Id.* at 17. The officer had testified that he *reconstructed* the path of the bullet by passing a piece of string starting at *approximately* the point where the bullet would have entered the victim's chest, passing it "through the bullet hole near the inspection sticker on the passenger's side of the windshield," and then taking it out the right fender of the car. Based on that testimony, the officer *inferred* that further extension of the rope would "reach the approximate shoulder height of a man five-foot-eleven-inches tall"—*i.e.*, the defendant. *Id*. The Court did *not* hold that the police officer was improperly permitted to testify, but that the trajectory check was unreliable:

> Because this trajectory check lacked any scientific basis and because a jury might be inclined to give weight to the apparent opinion testimony of a seasoned and experienced police officer describing his investigative methods, we hold that its admission constituted reversible error.

*Id*. And although the court clarified that the testimony would have been confusing to the jury if it had been permitted under the guise of lay witness testimony (simply placing "unnecessary and irrelevant evidence" before the jury, *id.* at 18), the *Walters* Court premised its holding on the *unreliable nature* of the police officer's testimony, which rested on his subjective opinion about where the bullet hit the victim and his approximation of where

24

further extension of the rope would lead. We have no such unreliable testimony here, just the factual and objective placement of trajectory rods in holes.

The mere fact that a witness is a law enforcement officer does not automatically transform his testimony into expert testimony. In *In re: Ondrel M.*, 173 Md. App. 223 (2007), we considered whether a police officer could testify that he knew the smell emanating from the car of a juvenile (ultimately adjudged a delinquent) was marijuana, even though the officer had not been qualified or admitted as an expert. *Id.* at 243. This presented a question of first impression, and we looked to a Texas case in which the court reasoned that although the smell gave rise to the conclusion that a crime was being committed, that alone did not make the officer's testimony that of an"expert": "It does not take an expert to identify the smell of marihuana smoke. Testimony as to the identity of an odor is admissible in some instances even though the person testifying is not an expert." *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).

We agreed in *Ondrel M.* that "[n]o specialized knowledge or experience is required in order to be familiar with the smell of marijuana." 173 Md. App. at 243. We also noted that "[i]n determining whether an opinion offered by a witness is lay opinion or expert testimony, it is not the status of the witness that is determinative. Rather, it is the nature of the testimony." *Id.* at 244. We endorsed the Texas court's holding that "training and experience" do not automatically render an opinion an expert opinion:

> "While [the police officer] may have had the potential to be qualified as an expert because she possessed knowledge, skill,

> experience and education, she was not testifying as an expert when she identified the marihuana. Rather, she was testifying based on her firsthand sensory experiences."

*Id.* at 244-45 (quoting *Osbourn*, 92 S.W.3d at 538).

This distinction drives our conclusion that Officer Costello's testimony was appropriate testimony for a layman. A police officer who does nothing more than *observe* the path of the bullet and place trajectory rods (in the same manner as any layman could) need not qualify as an expert to describe that process. Officer Costello relied on his own observations and placed the rods into the holes made by the bullet fired by Mr. Prince. He conducted no experiments, made no attempts at reconstruction, and "was not conveying information that required a specialized or scientific knowledge to understand." *People v. Caldwell*, 43 P.3d 663, 668 (Colo. App. 2001). In *Caldwell*, police recovered two bullets from the vehicle, and an investigating officer testified regarding "the appearance and location of the two bullet holes on the outside of the car, the hole inside the car, and the dimpling of the metal inside the car. From his own observations and the use of a dowel and string, the technician testified that he tracked the paths of the two bullets." *Id.* at 667. The Colorado Court of Appeals (affirming the conviction) held that although the officer had not been qualified as an expert, none of the information that he testified to required that he rely on his expertise—and "he testified about the location of the bullet holes and the paths of the bullets that were evident from the photographs without any additional explanation." *Id.* at 668.

The same is true here. Even if Mr. Prince's counsel had objected in a timely manner, Officer Costello's opinion fell well within the universe of lay testimony, and the trial court properly admitted it.

### B. The Trial Court Properly Denied Mr. Prince's Request for A Continuance.

Mr. Prince seems to suggest that the circuit court incorrectly interpreted the law as to whether he could offer the fact that he suffered from PTSD to negate the element of mental state. But the circuit court never got to that question—the court denied him a continuance for the purpose of developing expert testimony about his mental state, and he appeals from *that* decision, not a decision on the merits.

We review the decision to deny a motion for a continuance for an abuse of discretion: "[t]o grant or deny a . . . motion for continuance is 'in the sound discretion of the trial court.'" *Serio v. Baystate Props., LLC*, 209 Md. App. 545, 554 (2013) (quoting *Das v. Das*, 133 Md. App. 1, 31 (2000)); *see also* Md. Rule 2-508. Unless we conclude that the trial court acted arbitrarily, we will not review its decision on appeal, *Das*, 133 Md. App. at 16, and will reverse only in "exceptional instances where there was prejudicial error." *Thanos v. Mitchell*, 220 Md. 389, 392 (1959). We have described such an abuse of discretion as occurring only "'where no reasonable person would take the view adopted by the [trial] court," *North v. North*, 102 Md. App. 1, 13 (1994) (quoting *In re: Marriage of Morse*, 607 N.E.2d 632, 640 (Ill. App. Ct. 1993)), or where the court acts "'without reference to any guiding rules or principles,'" *id.* (quoting *Long John Silver's, Inc. v. Martinez*, 850 S.W.2d 773, 775 (Tex.

App. 1973)). To establish an abuse of discretion by the trial court in denying a continuance, the requesting party must show:

> (1) that he had a reasonable expectation of securing the evidence of the absent witness or witnesses within some reasonable time; (2) that the evidence was competent and material, and he believed that the case could not be fairly tried without it; and (3) that he had made diligent and proper efforts to secure the evidence.

*Smith v. State*, 103 Md. App. 310, 323 (1995) (citations omitted).

We find no abuse of discretion here. *First*, Mr. Prince offered no information on which the circuit court could have based a "reasonable expectation" that admissible or relevant evidence would be secured; at most, he offered a hope. As Dr. Fields herself put it, "there are *reasons to believe* that [Mr. Prince] suffers from Dissociative episodes, particularly when stressed in interpersonal relationships." (Emphasis added.) But with nothing more to connect that possibility to the incident in question, her general assertion did not compel the circuit court to find that she would reach a meaningful opinion at all, much less "within some reasonable time." *Second*, Dr. Fields offered no "competent and material" evidence—again, only a prospect that she might be able to tie Mr. Prince's previously diagnosed PTSD to the crime at issue. *Finally*, the circuit court did not err in finding that Mr. Prince's efforts did not constitute "diligent and proper efforts to secure the evidence" within the meaning of that phrase under *Smith*. Mr. Prince was diagnosed at Perkins in January 2011. Dr. Fields did not complete her preliminary diagnosis until fourteen months later, on March 11, 2012, and then it took another twelve days before that preliminary opinion was provided to the State, on the

28

Friday afternoon before the Monday of trial. The court would have been within its discretion either way, but we see no basis on this record to second-guess the court's thorough and well-thought-out explanation.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**