REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1879

September Term, 2013

_____

CRYSTAL HAYSLETT RANDALL

v.

STATE OF MARYLAND

_____

Leahy,
Reed,
Rodowsky, Lawrence F.,
    (Retired, specially assigned)

JJ.

_____

Opinion by Leahy, J.

_____

Filed: July 1, 2015

In 2009, Alma Matthews Lynch—a Montgomery County, Maryland resident—passed away, leaving a will devising, among other things, real property located in Arizona to the beneficiaries of her residuary estate. As designated under the will, the Register of Wills for Montgomery County appointed Ms. Lynch's niece, Appellant Crystal Hayslett Randall, and Ms. Lynch's partner, Clifton Terry, as co-personal representatives of the estate. These appointments proved ill-fated. Appellant, an Arizona resident, sold the Arizona property, failed to account for the sale within the Maryland Estate, and took the lion's share of the proceeds for herself.

A Montgomery County grand jury indicted Appellant for embezzlement and theft on July 21, 2011. The following day, the Circuit Court for Montgomery County issued a bench warrant. The Sheriff's Office entered the warrant into a national database, but efforts to confirm Appellant's address in Arizona delayed her arrest until December 7, 2012.

After several failed attempts to fight her extradition to Maryland, Appellant filed a motion to dismiss alleging denial of her right to a speedy trial. The circuit court denied that motion after holding a hearing. Additionally, before trial and then during her motion for acquittal, Appellant challenged the State of Maryland's jurisdiction to prosecute the charges filed against her, contending that jurisdiction existed in Arizona where the alleged crime occurred. The circuit court denied the motion for acquittal, concluding that Appellant had a duty to account for the proceeds to the Maryland estate and that the effect of the crime was felt in Maryland. At the close of her trial on August 14, 2013, the

jury convicted Appellant of both charges, and Appellant was sentenced to a total of ten years with all but 18 months suspended. In her timely appeal, Appellant presents three questions for our review:

I. "Did the Circuit Court err in denying Ms. Randall's motion to dismiss for failure to provide a speedy trial?"

II. "Do the courts of the State of Maryland have territorial jurisdiction to prosecute alleged theft and embezzlement offenses when all of the acts comprising the elements [of] those offenses occurred, if at all, in Arizona?"

III. "Did the Circuit Court err in permitting Linda Hawkins, the Deputy Register of Wills, to testify to the practices and procedures of the Montgomery County Regist[er] of Wills, when those practices and procedures are based on the Regist[er]'s interpretation of legal rules and requirements?"

We conclude that the circuit court did not err in denying Appellant's motion to dismiss on speedy-trial grounds because the State of Maryland engaged in a reasonably diligent attempt to locate Appellant in Arizona and bring her to trial. *See Doggett v. United States*, 505 U.S. 647, 651-52 (1992). Appellant—cloaked in authority issued by the State of Maryland as personal representative of the estate—had a duty to report the proceeds from the sale of the Arizona property in Maryland, and therefore, we hold that the State of Maryland possessed territorial jurisdiction to prosecute the crimes against Appellant under the "duty to account" theory espoused in *Wright v. State*, 339 Md. 399 (1995). Finally, we hold that even if the court erred in admitting the testimony of Ms. Hawkins as improper expert testimony by a lay witness, that error was harmless because her testimony, although relevant to the issue of jurisdiction and the general administration

2

of an estate, was not relevant to proving the charges Appellant was facing and was not otherwise prejudicial. We affirm the judgments of the circuit court.

## BACKGROUND

Appellant stood trial before a jury in the Circuit Court for Montgomery County on August 12-14, 2013, charged with embezzlement (fraudulent misappropriation by a fiduciary) and theft of property with a value of at least $10,000.00 but less than $100,000.00. The testimony and evidence presented at trial reflected the following.

A. Ms. Lynch's Last Will and Testament

Alma Matthews Lynch, a resident of Montgomery County, Maryland, executed her last will and testament on July 10, 2009. She designated Clifton Terry, her lifetime partner, and Appellant, her niece and a realtor by profession, as the co-personal representatives of her estate. After bequeathing certain property to various individuals, Ms. Lynch directed that her residuary estate be devised accordingly:

> All of the rest, residue and remainder of my estate and property of every nature, whether real, personal or mixed, wheresoever situate, of which I may die seized or possessed or to which I may in anywise be entitled at the time of my death, after allowance or payment therefrom of all estate, succession, legacy or inheritance taxes and charges of every description, I give, devise and bequeath as follows:
>
> A. THIRTY-FIVE PERCENT (35%) to the then surviving descendants of my sister, NADEAN M. HAYSLETT, who survive me for thirty (30) days, *per stirpes.*
>
> B. FIFTEEN PERCENT (15%) to my friend, CLIFTON W. TERRY, if he survives me for thirty (30) days.

C. The then remainder to my sister, NADEAN M. HAYSLETT, if she survive me for thirty (30) days. In the event that she does not so survive me, distribution shall be made in accordance with paragraph A of this Item.

The residuary estate included real property that Ms. Lynch owned in Arizona, located at 1342 West Coral Reef Drive in the town of Gilbert, Maricopa County (hereinafter "Arizona property"). Her family members were familiar with this residence, as they would gather at this home for Christmas.

Several months after executing her will, Ms. Lynch passed away on September 14, 2009. On September 23, 2009, the Register of Wills for Montgomery County, Maryland, issued an administrative probate order admitting Ms. Lynch's will dated July 10, 2009, into probate and appointing Appellant and Mr. Terry as personal representatives of the estate. That same day, a "List of Interested Persons" under Ms. Lynch's estate, totaling 20 individuals, was filed with the Maryland Register of Wills. Appellant and Mr. Terry thereafter filed the "First Account"[1] of the estate for the period of September 14, 2009, through July 30, 2010, which reflected the value of the total estate at $763,761.99. This

---

[1] A personal representative must file an "initial account of the administration of the property" containing a certificate from the personal representing regarding "(a) [t]he total value of property as shown in all inventories made prior to the date of the account; (b) [a]ll receipts of the estate during the period of administration; (c) "[t]he date of each purchase, sale, lease, transfer, compromise, settlement, disbursement, or distribution of assets of the estate, a description of each such transaction, and a statement of the amount by which it affects the amounts referred to in subsections (a) and (b) of this section; and (d) [t]he value of any assets remaining in the hands of the personal representative." Md. Code (1974, 2011 Repl. Vol.), Estates & Trusts Article ("E.T.") § 7-302. This first account must be made within 9 months from the date the personal representative was appointed. E.T. § 7-305(a)(1).

account did not include the value of the Arizona property,[2] although it identified expenses relating to the Arizona property that would be covered by the estate. On September 1, 2010, notice that the First Account was filed was sent to all Interested Persons pursuant to E.T. § 7-501.

B. Concealing the Sale

For over a decade, Appellant had been a resident of Gilbert, Arizona, where the Arizona property was located and also where her parents resided. Accordingly, Mr. Terry and Appellant agreed it only made sense for Appellant, a realtor by profession, to handle the sale of the Arizona property. Appellant retained an Arizona attorney on behalf of the estate, who, on November 3, 2009, filed a certified copy of a letter of administration issued by the State of Maryland in the Superior Court of Arizona in and for the County of Maricopa.[3] The letter was filed pursuant to Arizona Revised Statutes Annotated § 14-4204,[4] to declare Appellant and Mr. Terry's proof of authority to

---

[2] As discussed *infra* in Part II, foreign real property owned by a Maryland decedent need not be accounted for in an inventory, but instead, in the "information report" which is filed with the Register of Wills.

[3] As reflected in the first accounting of the estate in Maryland, the Arizona probate filing fee ($411.00) and the Arizona attorney's fees ($700.00) were covered by the Maryland estate.

[4] The statute provides: "If local administration, application or petition is not pending in this state, a domiciliary foreign personal representative may file with a court in this state in a county in which property belonging to the decedent is located certified copies of the appointment and of any official bond that has been given." Arizona Ariz. Rev. Stat. Ann. § 14-4204 (1998).

5

administer the estate's Arizona property.

Although both Mr. Terry and Appellant signed the listing agreement for the home at the outset, only Appellant served as the listing agent for the Arizona property. It took some time for the property to sell after it was put on the market, but on December 21, 2010, Appellant was able to sell the property for $220,000.00. After closing costs and satisfaction of a mortgage held by Wells Fargo on the property, the remaining proceeds totaled $90,960.30. As listing agent, Appellant received a $7,325 commission.[5]

As requested by the title company at settlement, on December 21st Appellant also filed an "estate tax affidavit." The affidavit, dated December 17 and sworn before a notary on December 20, was filed with the Official Records of Maricopa County Recorder in Arizona. Appellant avowed that "all debts owed by the Decedent at the time of death, all claims against the estate, all estate expenses, including costs of administration . . . have been paid in full." She further attested that "the estate of the Decedent was valued at $12,000 so the estate was less than the exemption provided under federal estate tax law and the Arizona statutes relating to estate taxes, and, therefore, no taxes were due."

Bank records reflect that on the day of settlement, all proceeds from the sale— $90,960.30—were wire-transferred to M&I Bank in Arizona and deposited into a

---

[5] David Newcomer, an investigator for Montgomery County prosecutor's office, testified at Appellant's trial that the listing agent takes his or her commission prior to the distribution of the net proceeds to the seller.

checking account that Appellant had previously opened in the "name of Alma M. Lynch Estate, Crystal L. Hayslett, personal representative[.]" Mr. Terry testified at trial that he was unaware Appellant had opened this account. Appellant was the only person authorized to conduct transactions relating to this account, and she immediately made two withdrawals: one in the amount of $74,734.88 and another for $1,000.00. With the larger withdrawal, Appellant purchased certified checks and then issued two certified checks to herself in amounts of $64,000.00 and $1,000,[6] and three certified checks to three beneficiaries under the will in the amounts of $4,855.00, $1,817.44, and $1,757.44. She also withdrew $1,280.00 in cash. After bank fees were withdrawn, at the end of the day on December 21st, only $15,255.67 remained in the account.

The next day, on December 22, 2010, Appellant made two additional transactions on the account: she transferred $1,502.44 to a minor beneficiary's trust account and $1,302.44 to an account owned by Appellant, leaving a balance of $12,450.79. On December 24, Appellant issued one check to the wife of one of the beneficiaries in the amount of $2,430.83, leaving a balance of $10,019.96 after bank fees. Finally, on December 30, just nine days after the settlement date, Appellant made one final withdrawal in the amount of $10,019.96 to herself, leaving the balance of the account at

---

[6] Appellant had the bank combine these checks and reissue one payable to herself in the amount of $65,000.00 on January 15, 2011. Mr. Newcomer testified at Appellant's trial that this was most likely because Appellant had changed her name from her maiden name, Hayslett, to her married name, Randall.

$0.[7]

On December 24, 2010, Appellant wrote a letter to the beneficiaries under the Lynch will, including Mr. Terry, notifying them that she was resigning from her role as personal representative. She formally submitted her resignation to the Arizona court on January 14, 2011.

C. Looking for Answers

Mr. Terry testified at trial that he had no knowledge that Appellant had sold the property until he reviewed the Wells Fargo mortgage balance and was advised by the bank that the property had been sold and the mortgage satisfied. Mr. Terry mailed Appellant a letter, dated December 30, 2010, advising that he had been informed that the loan had been paid off and "request[ed] that [she] apprise [him] of the full details of the sale and/or payoff transaction conducted with the bank at the earliest opportunity." He also testified that he tried to contact Appellant via phone and e-mail seeking answers, but was unsuccessful. Finally he received an e-mail from Appellant on January 15, 2011, although the e-mail did not make any mention of the sale of the home. Instead, the e-mail included attachments for invoices related to the carrying costs of the home, totaling approximately $650.00. In the e-mail, Appellant informed Mr. Terry, "This is all I have written out of all estate accounts that you do not have documentation on."

---

[7] Appellant ultimately voided this check and then on January 18, 2011, issued another check in the amount of $5,000.00 to Great American Title and another check in the amount of $4,000.00 payable to herself under her new married name. She also withdrew $1,009.96 in cash and paid a $10 bank fee.

8

Mr. Terry testified that, as one of the beneficiaries under the will, he did not receive any fraction of the proceeds from the sale, and the distributions that were, in fact, made to a few of the 20 beneficiaries were not executed pursuant to the dictates of the will.[8] Appellant's sister, Annette Hayslett, who was also a beneficiary, testified that she neither received notification that the Arizona home was sold nor any distributions from the sale proceeds.

Linda Hawkins, Chief Deputy of the Montgomery County Register of Wills, was called to testify at trial on behalf of the State. She explained that she had reviewed the probate file, and that the Maryland estate had allotted $33,243.35 in expenses to the Arizona property during the probate process. She did not see any report of sale regarding the Arizona property before December 2012 (the time of Appellant's eventual arrest).

D. The State's Investigation

In February, 2011, Mr. Terry contacted the State's Attorney's Office for Montgomery County to report his concerns about Appellant's sale of the Arizona property. David Newcomer, Chief Investigator for the State's Attorney's Office for Montgomery County, conducted the ensuing investigation. He testified at trial that he contacted the Maricopa County Superior Court in Arizona for a complete copy of all

---

[8] Mr. Terry further testified that the will provided that he and Appellant receive money-market accounts to execute their duties, but the will did not provide for any additional compensation. Mr. Terry petitioned the court in July 2010 for compensation in the amount of $36,000.00 for his part in selling Ms. Lynch's company—Source Staffing—by submitting a petition to the Orphan's Court, and Appellant opposed. After mediation, he accepted $17,000.00, which was reflected in the Final Account.

documents filed by Appellant with the court. The copy of the file that he received was admitted into evidence and included the following documents: a Proof of Authority, State of Maryland Letters of Administration, and a notification of Appellant's resignation as personal representative.[9]

Mr. Newcomer's investigation uncovered Appellant's activities after the M&I account was emptied and closed. A search of the Maricopa County land records revealed that about a week after Appellant drained the checking account, on January 7, 2011, the trustee on a deed of trust on the property located at 1985 Bahama Drive, Gilbert, Arizona, filed a "notice of trustee's sale", notifying Appellant that the bank would be foreclosing on the property for default on a loan. Appellant had owned the property since 2002, and she listed 1985 Bahama Drive as her address on the documents filed along with the Proof of Authority in the Maricopa County Court. Appellant's property was ultimately sold on April 8, 2011.

Meanwhile, by a warranty deed created on January 5, 2011 and recorded on January 20, 2011, Appellant and her husband purchased another property located at 2613 East Jessica Lane, Phoenix, Arizona for the sale price of $60,000.00. The transaction was a full-cash purchase without financing.

It was not until about two years following the sale of the Arizona property, on

---

[9] The Estate Tax Affidavit was not a part of the probate file, as it was filed separately in the official records of the Maricopa County Recording Office. Mr. Newcomer testified that he found the affidavit through his independent search of Maricopa County public records.

December 13, 2012, that Mr. Terry, acting as the sole personal representative, filed in the Orphan's Court for Montgomery County, Maryland, the Revised Second and Final Account of Ms. Lynch's estate for the period of July 30, 2010 through May 31, 2011. The public docket history of Ms. Lynch's estate available with the Register of Wills, although not introduced at trial, reflects that in the intervening two years, various actions were conducted regarding the estate, including various claims by creditors, exceptions filed to the first final account, and disputes regarding attorney's fees. The final account documented the distributions made to the beneficiaries of Ms. Lynch's estate after expenses and taxes were paid. Because the proceeds from the sale were never remitted to the Maryland estate, the final account did not reflect the sale of the Arizona property or the proceeds therefrom.

E. Appellant's Case at Trial

The State concluded its case after presenting testimony from Mr. Terry, the co-personal representative, Mr. Newcomer, the State's investigator, Annette Hayslett, Appellant's sister, and Ms. Hawkins, the Deputy Register of Wills. Appellant moved for judgment of acquittal. She claimed a lack of evidence upon which a reasonable jury could conclude beyond a reasonable doubt that (1) the State of Maryland possessed jurisdiction to prosecute Appellant or (2) Appellant possessed the requisite intent to commit the crimes alleged. Appellant's defense at trial was that she retained the funds by innocent misunderstanding, believing she was entitled to the funds from her work as personal representative and in closing Ms. Lynch's company, Source Staffing. The court

11

denied the motion, but reserved its ruling on jurisdiction until the close of all evidence.

Appellant called two witnesses on her behalf. First, Dena Feeney, the attorney who assisted in the Maryland estate administration,[10] testified that she advised Appellant to consult with an Arizona attorney for handling the Arizona property, but did not have personal knowledge regarding what was done in Arizona thereafter. She advised both Mr. Terry and Appellant that it would be "possible" but not easy to close the Maryland estate before the Arizona property was sold. Conwell Akers, the director of operations at Source Staffing, Ms. Lynch's company, also testified very briefly that Ms. Lynch introduced both Mr. Terry and Appellant to the staff members before her death with the intention that they would run and sell the company after she passed.

At the close of all evidence, Appellant renewed her motion for acquittal. The court denied the motion, and as to the jurisdictional issue, relied on *Wright v. State*, 339 Md. 399 (1995), discussed *infra*, because "the *Wright* principle kicks in where the duty to account would authorize jurisdiction within the State of Maryland." (Italics added).

On August 14, 2013, the jury convicted Appellant of theft of property having a value of at least $10,000 but less than $100,000 and embezzlement (misappropriation by a fiduciary). On October 17, 2013, the circuit court imposed a 10-year sentence for theft and a concurrent five-year sentence for embezzlement, with all but 18 months suspended, and credit for time served. The court also ordered that upon Appellant's release from

---

[10] Appellant waived her attorney-client privilege on the record.

12

incarceration, Appellant will be placed on supervised probation for five years with conditions, including restitution. Appellant noted a timely appeal on October 21, 2013 within 30 days of sentencing.

We include additional facts in the discussion relevant to the issues there examined.

## DISCUSSION

### I.

### *Speedy Trial*

Appellant contends that the circuit court erred in denying her motion to dismiss for violation of her constitutional right to a speedy trial. When reviewing a circuit court's judgment on a motion to dismiss claiming deprivation of the right to a speedy trial, "we make our own independent constitutional analysis." *Glover v. State*, 368 Md. 211, 220 (2002) (citing *State v. Bailey*, 319 Md. 392, 415, *cert. denied,* 498 U.S. 841 (1990)). "We perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand; in so doing, we accept a lower court's findings of fact unless clearly erroneous." *Id.* at 221 (citations omitted).

Appellant filed a motion to dismiss for failure to provide a speedy trial on May 10, 2013. The State filed an opposition on May 29, 2013**,** and Appellant filed a reply on June 4, 2013, attaching, among other items, an affidavit in which she attested to her correct address and the prejudice caused by the delay of her trial. On June 6, 2013, the circuit court held a hearing on Appellant's motion to dismiss, and the testimony and evidence presented reflected the following.

David Newcomer testified that during the investigation he conducted in 2011, he attempted to notify Appellant of the complaint and ensuing investigation by mailing "a letter, we call a target letter[,]" via certified mail to four possible Arizona addresses for Appellant.[11] All of these letters were returned as undeliverable or unclaimed. Thereafter, on July 21, 2011, a Montgomery County grand jury indicted Appellant, and on the following day the circuit court issued a bench warrant for Appellant's arrest. Roughly a week after the indictment was returned, Mr. Newcomer went to the Montgomery County Sheriff's Office Warrant and Fugitive Section and shared all the information gathered during his investigation.

On August 1, 2011, the Montgomery County Sheriff's Office—which oversees more than 2,000 active warrants—entered the warrant into the National Criminal Information Center ("NCIC"),[12] a 24-hour system accessible to law enforcement officers

---

[11] The four addresses included: 1985 South Bahama Drive, Gilbert, Arizona; 2613 East Jessica Lane, Phoenix, Arizona; 3131 East Camelback Road, Suite 125, Phoenix, Arizona (a business address); and 1745 South Alma School Road, Suite 115, Mesa, Arizona (a possible business address).

[12] Launched in 1967, NCIC, as of 2014, contains over 13 million active records and averages 12 million transactions per day. *National Crime Information Center*, Federal Bureau of Investigation, https://www.fbi.gov/about-us/cjis/ncic (last visited June 19, 2015), http://perma.cc/F73U-PE32. As explained by the FBI,

> Criminal justice agencies enter records into NCIC that are accessible to law enforcement agencies nationwide. For example, a law enforcement officer can search NCIC during a traffic stop to determine if the vehicle in question is stolen or if the driver is wanted by law enforcement. The system responds instantly. However, a positive response from NCIC is not probable cause for an officer to take action. NCIC policy requires the

(continued . . .)

across the country. The warrant was also entered into MILES, a state system, on August 1, 2011, and into E-Justice, a local system, on January 26, 2011.

The Montgomery County Sheriff's Office does not have the authority to arrest an individual outside of Maryland. On August 2, 2011, the Office faxed a copy of the warrant and all of Appellant's identifying information to the Maricopa County Sheriff's Office in Arizona listing the address of 2613 E. Jessica Lane, Phoenix, AZ 85040.

Mr. Newcomer testified that after several months the warrant had not been served, so he checked NCIC and re-conducted background checks. Unfortunately, this did not reveal any new information. Then, about three to four times over a period of eight or nine months, Mr. Newcomer conducted additional background checks and contacted the Arizona Motor Vehicle Administration to see if there was any new address for Appellant. In late October 2012, while conducting another check, Mr. Newcomer received information that Appellant updated her cell phone plan using an address at 729 North Octocello Lane in Gilbert, Arizona. He forwarded this information to the fugitive unit in the Montgomery County Sheriff's Office. This address was listed as Appellant's parents' house on the Sheriff's Office's work-up sheet.

On December 6, 2012, Sergeant Strawderman with the Montgomery County

inquiring agency to make contact with the entering agency to verify the information is accurate and up-to-date. Once the record is confirmed, the inquiring agency may take action to arrest a fugitive, return a missing person, charge a subject with violation of a protection order, or recover stolen property.

*Id.*

15

Sheriff's Office called the Phoenix City Police Department to follow up on the warrant. A Phoenix police officer said they would attempt service on Appellant's Jessica Lane address. Sergeant Strawderman also spoke with an officer from the Gilbert County Police Department, who advised that their Department would attempt service on the Octocello Lane address in Gilbert. That same day, Sergeant Strawderman faxed another copy of Appellant's warrant to the Phoenix Police Department. On December 7, 2012, the Police Department in Arizona executed the warrant and arrested Appellant at the 2631 East Jessica Lane address.

Appellant was released on bond from the warrant for about three months before attending an extradition hearing in Arizona. Further details surrounding this hearing are not in the record before this Court.[13] The State also proffered to the court at her first appearance, and the record likewise reflects, that she filed a habeas proceeding in Arizona as well. Though again, the record does not contain any more details about this proceeding.

On February 4, 2013, the Governor of Arizona issued an extradition warrant commanding the local Arizona County Sheriff's Office to deliver Appellant to the Montgomery County Sheriff's Office. On March 7, 2013, deputies from the Montgomery County Sheriff's Office traveled to Arizona to apprehend and arrest

---

[13] It appears that Appellant was not represented by an attorney at this time. In an e-mail dated December 24, 2012, Appellant e-mailed the prosecutor advising of her lack of representation and asking for a copy of the indictment.

16

Appellant. After Appellant was extradited to Maryland the following day,[14] she made an initial appearance in the Circuit Court for Montgomery County on March 8, 2013 at which time the court set Appellant's bond at $10,000 cash surety. She posted the bond and was released from commitment on March 13, 2013. Appellant's trial began on August 12, 2013.[15]

The Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee an accused's right to a speedy trial.[16] *Divver v.*

---

[14] Maryland's extradition law—based on the Uniform Criminal Extradition Act of 1936—is codified in Maryland Code (2001, 2008 Repl. Vol.) Criminal Procedure Article §§ 9-101 to -128. *See also Burton v. Mumford,* 219 Md. App. 673, 685-87 (2014) (discussing the history and current iteration of Maryland's extradition law), *cert. denied,* 441 Md. 218 (2015).

[15] Appellant does not claim violation of the "*Hicks* Rule" or "180 day rule." The State is required under Maryland Code (2001, 2008 Repl. Vol.), Criminal Procedure Article ("CP") § 6–103, and Maryland Rule 4–271(a), to bring criminal cases to trial within 180 days of a defendant's first appearance in the circuit court. In *State v. Hicks,* 285 Md. 310, 334-38 (1979), the Court of Appeals held that the provisions of the predecessor statute to CP § 6-103 and the substantively identical provisions of the predecessor rule to Maryland Rule 4-271(a) were mandatory, and further held that dismissal of the charges pending against a defendant was the sanction for a violation of the statute's mandate.

[16] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" Similarly, Article 21 of the Declaration of Rights of the Maryland Constitution provides "[t]hat in all criminal prosecutions, every man hath a right . . . to a speedy trial by an impartial jury[.]" The Maryland Court of Appeals "considers United States Supreme Court precedents interpreting the sixth amendment to be 'very persuasive, although not necessarily controlling,' as to the proper construction of Maryland's parallel Article 21 right.'" *Divver,* 356 Md. at 387 (quoting *Stewart v. State,* 282 Md. 557, 570 (1978)) (internal quotation marks omitted).

*State*, 356 Md. 379, 387-88 (1999). The Court of Appeals applies the constitutional analysis articulated in *Barker v. Wingo*, 407 U.S. 514, 529-30 (1972), when reviewing a speedy-trial challenge under the Sixth Amendment and Article 21. *Glover*, 368 Md. at 222-21 (citing *Divver*, 356 Md. at 388).

In *Barker v. Wingo*, 407 U.S. 514, 529-30 (1972), the Supreme Court recognized that the right to a speedy trial is different from any other right enshrined in the Constitution because it protects not just the individual who is accused, but also the community at large. *Id.* at 519-20. Justice Powell, writing for the Court, observed that the inability of courts to provide prompt trials can have significant impacts on society. For example, delays between arrest and trial increase pretrial detention costs, give persons released on bond opportunities to commit other crimes or escape justice, and can have detrimental effects on rehabilitation. *Id.* at 520. Moreover, deprivation of the right may actually work to the accused's advantage:

> Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-in-crimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself.

*Id.* at 521.

The Supreme Court rejected inflexible approaches to determining when the right is violated, and instructed that "any inquiry into a speedy trial claim necessitates a

functional analysis of the right in the particular context of the case." *Id.* at 522 (citing

*Beavers v. Haubert*, 198 U.S. 77, 87 (1905)).   The Court adopted a balancing approach

wherein "the conduct of both the prosecution and the defendant are weighed." *Id.* at 530.

The factors that should be balanced in making a speedy trial determination include the

"[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and

prejudice to the defendant." *Id.* at 530.  None of these factors are sufficient alone to

establish deprivation of the right to a speedy trial; instead, they "must be considered

together with such other circumstances as may be relevant." *Id.* at 533.  Courts must

"engage in a difficult and sensitive balancing process" while maintaining "full

recognition that the accused's interest in a speedy trial is specifically affirmed in the

Constitution." *Id.*  We turn to our consideration of the *Barker* factors.

## 1. Length of Delay

The "length of delay" factor is "a term of art that serves two separate and distinct

functions in a speedy trial analysis." *Ratchford v. State*, 141 Md. App. 354, 358 (2001).

First, "it identifies the threshold that must be crossed before further analysis is called

for[,]" marking "the minimal point" of constitutional dimension. *Id.*  A lengthy post-

indictment, pretrial delay is presumptively prejudicial and requires scrutiny under the

*Barker* constitutional analysis.  *Doggett*, *supra,* 505 U.S. at 651-52. Once the delay

triggers the four-factored analysis, we view the length of delay on its merits as a distinct

inquiry, which is heavily impacted by the other factors. *Ratchford*, 141 Md. App. at 359-

60.   But, unless the delay crosses the line from ordinary delay to presumptively

prejudicial delay, "there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530.

"[T]he length of delay is measured from the day of arrest or filing of the indictment, information, or other formal charges to the date of trial." *Divver*, 356 Md. at 388-89 (citing *State v. Gee*, 298 Md. 565, 569, *cert. denied*, 467 U.S. 1244 (1984)). In the case at bar, the circuit court found that the 17-month delay from the indictment to the arrest weighed against the State.[17] The filing of the indictment on July 21, 2011 triggered the speedy-trial clock in this case, and the delay from this date to Appellant's trial on August 12, 2013 was 2 years and 22 days. We conclude delay was of the magnitude to trigger review under *Barker*. Indeed, "[t]he Court of Appeals has consistently held . . . that a delay of more than one year and fourteen days is 'presumptively prejudicial' and requires balancing the remaining factors." *Lloyd v. State*, 207 Md. App. 322, 328 (2012) (citing *Glover v. State,* 368 Md. 211, 223 (2002)), *cert. denied*, 430 Md. 12 (2013).

---

[17] Appellant asserts that the circuit court "correctly recognized that the delay in bringing [Appellant] to trial was of sufficient length to raise a presumption of prejudice[,]" but he does not discuss the actual length of delay calculated by the court. The circuit court measured the "length of delay" from the filing of the indictment **to the date of arrest,** concluding that the length of delay was 17 months. However, the right at issue here is not the right to be arrested in a timely manner, but the right to a speedy *trial*. *See, e.g., Davison v. State*, 87 Md. App. 105, 111 (1991) ("'[T]he speedy trial clock starts ticking when a person is arrested or when a formal charge is filed against him,' *State v. Bailey*, 319 Md. 392, 410, 572 A.2d 544 (1990), and stops ticking when the case is tried, *see Epps v. State*, 276 Md. 96, 109, 345 A.2d 62 (1975)[.]"). The State concedes this error in its brief. Instead, the court should have accorded the time period from arrest to trial "neutral" status in weighing the *reason* for delay factor if it was not disputed by Appellant, rather than reducing the actual length of delay.

20

On its merits, the State concedes, and we agree, that the delay of nearly 25 months clearly weighs in favor of Appellant. However, as noted above, the gravity of this weight in the final balancing is heavily influenced by the other *Barker* factors, particularly the "reason" for the delay; "[i]t may gain weight or it may lose weight because of circumstances that have nothing to do with the mere ticking of the clock." *Ratchford*, 141 Md. App. at 359.

## 2. Reason for Delay

It is commonsensical that when analyzing the State's reasons for the delay, the amount of weight that should be assigned to this factor in favor of either the State or the accused depends on the particular reason given. *See Barker*, 407 U.S. at 531. The Supreme Court has observed that the spectrum ranges from diligent prosecution to bad-faith delay, and along this spectrum, "official negligence in bringing an accused to trial occupies the middle ground." *Doggett*, 505 U.S. at 656-57; *accord State v. Lawless,* 13 Md. App. 220, 237-40 (1971) (describing the "gradations" of culpability of state conduct). A government's deliberate attempt to delay trial and impede the defense weighs heavily against the government, whereas negligence by the government should weigh less heavily, although "the ultimate responsibility for such circumstances must rest with the government rather than the defendant." *Barker*, 407 U.S. at 531. Accordingly, we review the reasons for delay in this case.

### i.  *Period from July 21, 2011 through December 7, 2012*

This time period—the most questionable one—spanned from the filing of the

21

indictment to Appellant's arrest, accruing a delay of one year, four months and 16 days.[18] Appellant argues that "[t]he perfunctory actions taken by the State in this case do not reflect any serious effort to secure [Appellant's] presence at trial," and that the State "washed its hands" of its duty to arrest Appellant. In other words, Appellant does not argue that the State affirmatively acted in bad faith, but rather, that the State acted negligently through inaction.

It is certainly true that although a defendant cannot avoid apprehension, he or she "has no duty to bring himself to trial; the State has that duty[.]" *Barker*, 407 U.S. at 527 (footnote omitted). In executing this duty, the State must act with "reasonable diligence." *Doggett*, 505 U.S. at 656; *see also In re Thomas*, 372 Md. 50, 75 (2002) ("[T]here is an obligation of the State to at least attempt, in a reasonable manner, to locate alleged delinquents."). Yet, so long as the State acts with reasonable diligence, and absent any specific prejudice to the defense's case, a speedy trial claim fails "however great the delay." *Doggett*, 505 U.S. at 656.

The testimony and evidence reflected that pre-indictment notices sent via certified mail to four addresses for Appellant were returned as undeliverable or unclaimed. Following the indictment, the Montgomery County Sheriff's Office entered the warrant into the NCIC on August 2, 2011, and faxed a copy of the warrant to the Arizona Sheriff's Office. The Montgomery County Sheriff's office made no contact with

---

[18] Although the circuit court described the delay as 17 months, it is more accurately expressed as 16 ½ months.

22

Appellant or the Arizona Sheriff's Office for 16 months; however, the state investigator periodically reviewed NCIC, conducted background checks, and contacted the Arizona Vehicle Administration to locate any new addresses for Appellant. In October 2012, the investigator received information that Appellant renewed her cell phone contract registered at a different Arizona address that he did not have and relayed this information to the Sheriff's Office. Two months later, in December 2012, the Sheriff's Office contacted two separate Arizona Sheriff's Offices, and both advised that they would attempt to serve the warrant, and the next day, Appellant was arrested in Arizona.

Based on this evidence, the circuit court found that "the primary reason for the delay is the fact that defendant lived out of state in Arizona, and that Maryland authorities really had no control over her whatsoever, they had no ability to arrest her directly. They really had no certain[t]y of where she lived or her location." The court further found that the investigator ran checks every few months to see if anything was "popping up on her." Based on this, the court concluded that the reason for the delay was not attributable to the State.

We are not persuaded that the circuit court's findings were clearly erroneous or that the State's actions were legally insufficient to satisfy the State's obligation to procure Appellant with "reasonable diligence" based on the facts and circumstances of this case. Although Appellant was ultimately arrested at the address listed on the original warrant, this is not a case in which the State was apathetic about information which it *knew* was accurate. *See In re Thomas J.*, 123 Md. App. 396, 407 (2000) ("'When the State sits idly

by and does nothing with the information available to it, it cannot claim that it made a good faith effort to locate the defendant.'" (quoting *State v. Hunnel*, 52 P.2d 947, 947 (Wash. Ct. App. 1988))), *aff'd,* 372 Md. 50 (2002). The court credited the investigator's testimony that the prior mailings were returned unclaimed and undeliverable. The State claimed, and the circuit court apparently found persuasive, that this aroused uncertainty regarding whether the addresses on file for Appellant were correct. Moreover, the State also did not fail to investigate this ambiguity; the investigator checked NCIC, conducted background checks, and contacted the Arizona motor vehicle administration for a new address. *Cf. Doggett*, 505 U.S. at 652-53 ("For six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that [the defendant] was living abroad, and, had they done so, they could have found him within minutes. While the Government's lethargy may have reflected no more than [the defendant's] relative unimportance in the world of drug trafficking, it was still findable negligence, and the finding stands.").

Appellant attempts to analogize to two other cases. The first, *United States v. Mendoza*, 530 F.3d 758 (9th Cir. 2008), involved an IRS investigation of the defendant for underreporting his income. The IRS attempted to serve the defendant via his attorney with a grand jury subpoena for handprint and fingerprint exemplars, but the attorney no longer represented him. *Id.* at 761. An IRS agent then called the defendant's wife, who relayed that the defendant moved to the Philippines and provided contact information for his family there. *Id.* The IRS had two successful communications via phone with the

24

defendant while he was in the Philippines. *Id.* Thereafter, the defendant was indicted, and his warrant was entered into the law enforcement database. *Id.* at 762. However, by the time the defendant returned to the United States, and was arrested relatively soon thereafter, eight years had passed since the indictment was filed. *Id.* The district court denied the defendant's motion to dismiss on speedy trial grounds, and the defendant was ultimately convicted. *Id.*

On appeal before the Ninth Circuit, the court held that "[t]he government has 'some obligation' to pursue a defendant and bring him to trial." *Id.* at 762-63 (citing *United States v. Sandoval*, 990 F.2d 481, 485 (9th Cir. 1993)). Although "the government is not required 'to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension[,]'" the court explained, the government must make a "serious effort" to find the defendant if the defendant is not avoiding detection or else the government will be considered negligent. *Id.* at 763 (citations omitted). The court concluded that despite having the defendant's relatives' and spouse's contact information, the IRS agent made no effort to notify the defendant of the indictment and noted that there was no evidence that the defendant was keeping his whereabouts unknown. *Id.* The record was "silent as to any efforts by the government to apprehend [the defendant] beyond merely entering [the defendant's] warrant in the law enforcement database." *Id.* at 764. "[T]he government was required to make some effort to notify [the defendant] of the indictment, or otherwise continue to actively attempt to bring him to trial, or else risk that [the defendant] would remain abroad while the constitutional

speedy-trial clock ticked." *Id.* at 763. Accordingly, the court determined that the government's negligence caused the delay, thereby weighing the "reason for delay" factor against the State. *Id.* The court ultimately remanded and ordered that the defendant's indictment be dismissed. *Id.* at 765.

The instant case is distinguishable for several reasons. First, the defendant in *Mendoza* was located in a foreign country, and instead of initiating international extradition procedures, the IRS simply entered a warrant into a database so that the defendant would be detained if he returned to the United States. As a result, there was no other sovereign with the authority or intention of apprehending the defendant, and the only way the defendant would be apprehended—absent any knowledge of the indictment—was if he elected to return to the United States on his own. Here, Appellant was residing in a different state, and the warrant entered into NCIC bestowed upon Arizona both the authority and responsibility to apprehend Appellant. In *Mendoza*, eight years had elapsed before the defendant was arrested, compared to the 16½ months between Appellant's indictment in Maryland and her subsequent arrest in Arizona.

Second, in *Mendoza,* the IRS agent had *successfully* contacted the defendant and his family members previously on more than one occasion about the case. Here, the State had never successfully communicated with Appellant. Instead, the State attempted to send pre-indictment notifications to all four of Appellant's known addresses, and those letters were returned as undeliverable and unclaimed. Third, the IRS agent in *Mendoza* did not take any action after inputting the warrant. Here, after entering the warrant into

26

NCIC, the State was skeptical of Appellant's address, and regardless of whether the State's skepticism was mistaken, the State proactively followed-up by conducting background checks and contacting the Arizona motor vehicle administration.

Appellant also relies on *In re Thomas J.*, *supra*, 132 Md. App. 396 (2000). In that case, the juvenile-defendant was arrested for attempted armed robbery and related offenses, but was released the next day. *Id.* at 400-01. A delinquency petition was then filed, and although summonses were mailed to the defendant at his address, the defendant did not appear for his arraignment hearing. *Id.* at 401. Two additional sets of summonses were returned by the Sheriff's Office as "unable to contact" and by the Post Office as "moved left no address." *Id.* It later came to light that the defendant had moved to another residence in the same county. *Id.* The court then issued a writ for body attachment, and when the defendant was never apprehended, the court held writ review hearings annually for the next three years. *Id.* at 402. The defendant was finally served with the writ three years and two months after his arrest and moved to dismiss on speedy trial grounds, which the circuit court denied. *Id.*

On appeal, we reversed. Regarding the State's reason for the delay, we held that "[a]lthough we recognize that the State probably could have located [the defendant] and could have issued the writ of body attachment earlier, rather than allow it to remain outstanding for years, we do not find this case to be deliberate and knowing inaction, but rather, 'less-than-diligent' action.'" *Id.* at 405-06. Indeed, we acknowledged that "[h]ad the State attempted to find [the defendant], it probably could have found him within

27

minutes" and that the defendant had been openly living in the same county in which the incident occurred and was not deliberately attempting to delay proceedings. *Id.* at 406-07. We therefore held that "the fault of the State, if any, was minimal," and weighed that factor against the State, but not heavily. *Id.* at 406-07. It was only when we balanced all factors together that we concluded they weighed against the State and that the delinquency petition should have been dismissed. *Id.* at 412.

Again, the instant case is distinguishable. *In re Thomas* involved a defendant who moved to a new residence in the same Maryland county, and the State had several uncomplicated options to locate the defendant, but failed to take them. In the instant case, Appellant was in another state, beyond the arresting authority of the Montgomery County Sheriff's Office. And, unlike the 'less-than-diligent" action by state officials in *In re Thomas*, the state officials here engaged in ongoing follow-up measures to locate Appellant's whereabouts.

We acknowledge Appellant's argument that the State could have contacted the Arizona Sheriff's Office sooner, but we are also cognizant of the fact that the Montgomery County's Sheriff's Office handles over 2,000 outstanding warrants at any given time,[19] and what is constitutionally required is reasonable diligence, not perfection. We are satisfied, as was the circuit court, that the State engaged in a "reasonably diligent"

---

[19] Sergeant David Bell testified at Appellant's speedy-trial hearing that the Montgomery County Sheriff's Office had, at that time, over 2,000 active warrants and 12 deputies to serve those warrants.

attempt to apprehend Appellant given the facts presented in this case. We conclude that while the time period of delay is attributable to the State, this factor weighs only slightly in favor of Appellant.

ii.     *Period from December 7, 2012 to March 8, 2013*

This time period spanned from Appellant's arrest to her extradition to Maryland, accruing a delay of three months. During this period, Appellant fought extradition to Maryland. Although it is was entirely within her right to fight extradition, it belies any fierce desire for a speedy trial. We find this period to be attributable to Appellant and weighs slightly in favor of the State.

iii.     *Period from March 8, 2013 to August 12, 2013*

This time period spanned from Appellant's extradition to Maryland to the first day of Appellant's trial, accruing a delay of five months. Appellant does not argue that any impropriety occurred during this time, as this period involved the natural progression from arrest to trial. This time period is attributable to neither party, so we assign this timeframe neutral weight.

### 3. Assertion of Speedy Trial Right

"Often the strength and timeliness of a defendant's assertion of his speedy trial right indicate whether the delay has been lengthy and whether the defendant begins to experience prejudice from that delay." *Glover*, *supra,* 368 Md. at 228 (citations omitted); *see also Barker,* 407 U.S. at 531 ("Whether and how a defendant asserts his right is closely related to the other factors[,]" as "[t]he strength of his efforts will be affected by

29

the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences.").

The State emphasizes that Appellant fought extradition in Arizona for three months after her arrest on December 7, 2012, and despite appearing before the circuit court twice after she was returned to Maryland in March 2013, she did not assert her right to a speedy trial until May. The circuit court found this to be relevant in its ruling, finding that Appellant was aware of a potential violation of her right to speedy trial five months before she asserted her right.

Although it is true that Appellant waited five months to assert her rights upon learning of the indictment, three of those months were spent challenging extradition, which was within her right to do, and defense counsel proffered that she was unrepresented by counsel at the time. We do not consider Appellant's failure to assert her speedy trial right at that time, to be particularly influential to our analysis. Upon Appellant's extradition to Maryland, she appeared before the circuit court on March 8, 2013 for a bond hearing and March 15 for a scheduling hearing, but did not assert her speedy-trial right until May 10, 2013. Because Appellant was mostly unrepresented during this period of time, we accord neutral weight overall to the strength and timeliness of Appellant's assertion of her right.

### 4. Prejudice

As to prejudice, a court should consider if the delay impacted the three interests that the right to speedy trial was designed to protect: "(i) to prevent oppressive pretrial

incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker,* 407 U.S. at 532. Appellant does not argue oppressive pre-trial incarceration or heightened anxiety or concern, nor could she based on the record. The only interest at issue in the instant case, the last, is also the most significant "because the inability of a defendant to adequately prepare his case skews the fairness of the entire system." *Id.*

This Court explained Maryland's approach to determining prejudice and the allocation of burdens in *State v. Lawless*:

> Traditionally, three approaches have been used to arrive at a determination of prejudice. One approach is that it is incumbent upon the accused to make a showing of actual prejudice or at least a strong possibility of prejudice resulting to him or to his defense from the delay. Another approach is that prejudice will be conclusively presumed and necessarily follows from long delay. **The middle position, and that used in this State, is that a certain *quantitative* and *qualitative* degree of delay gives rise to a rebuttable presumption of prejudice and will shift the burden of going forward with the evidence from the accused to the State.** Before that critical point is reached, there rests upon the accused, as the moving party, the burden of persuading the hearing judge either (1) that he has suffered actual prejudice, in cases where he has made no demand for a speedy trial, or (2) that he has suffered the strong possibility of prejudice, in cases where he has made a demand for a speedy trial. Once that critical point has been reached, however, the presumption of prejudice arises and the burden of going forward with the evidence shifts to the State. **That critical point on the delay scale where the presumption arises and where the burden shifts has been denominated the point of 'substantial' delay. To rebut the presumption, the State must persuade the hearing judge that the accused suffered no serious prejudice beyond that resulting from ordinary and inevitable delay.**

13 Md. App. 220, 232-33 (1971) (emphasis added) (citations and footnotes omitted); *accord In re Thomas J., supra,* 132 Md. App. at 412 (citing *Lawless* in the context of

applying the *Barker* analysis to hold that the burden shifted to the State due to the three-year delay); *Wilson & Green v. State*, 34 Md. App. 294, 299 n.3 (1976) (citing *Lawless* in the context of the *Barker* analysis to hold that the burden shifted to the State), *cert. denied,* 280 Md. 730, 280 Md. 735 (1977).  Thus, not every accused must present an affirmative demonstration of prejudice to prove a denial of the right to a speedy trial. *Davidson v. State*, 87 Md. App. 105, 115 (1991) (citing *Moore v. Arizona*, 414 U.S. 26 (1973)).  This is so because "time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Doggett*, 505 U.S. at 655 (quoting *Barker*, 407 U.S. at 532).  Instead, courts are left to "recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* The Supreme Court has clarified, however, that presumptive prejudice alone cannot establish a speedy-trial violation; "it is a part of the mix of relevant facts, and its importance **increases with the length of the delay**." *Id.* at 656 (emphasis added) (citing *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)).

Here, although the length of the delay was sufficient to trigger the *Barker* factors, the issue is whether the qualitative (reasons behind the delay) and quantitative (length) degree of the delay was sufficient to warrant a presumption of prejudice requiring the burden to shift onto the State to prove there was no prejudice.[20]  We consider *State v.*

---

[20] As we have explained:

(continued . . .)

32

*Lawless* to be instructive on this point.   There we held that the defendant was not denied his speedy-trial right despite the lapse of 18 months from his indictment *to his arraignment*. 13 Md. App. at 243. During this time period, the defendant was being transferred to and from various correctional entities. *Id.* at 240. The State unsuccessfully attempted to serve the defendant with two summonses, but finally succeeded on its third try. *Id.*   We did not characterize the reason for the delay in that case as a bad-faith omission or unpardonable neglect, but as "inadvertent inaction" or "less-than-diligent action," ultimately finding any fault on the State's behalf to be minimal.  *Id.* at 239-40. We also concluded that although the defendant claimed a lapse in memory, there was no significant evidence of other prejudice.  *Id.* at 242-43.  Notably, we explained that "the mere running of the calendar will not be viewed in isolation and has little significance divorced from the questions of motivation for delay and prejudice, which are, respectively, its cause and its effect." *Id.* at 237.   Based on the minimal value that we assigned to the "reason for delay" and "prejudice" factors, we concluded that the 18-

---

There is, of course, a distinction between the threshold inquiry into whether the delay was of 'constitutional dimension' in the Barker sense and the later inquiry as to 'substantial' delay. Under this approach the Court looks first to see if there is some minimal delay which 'triggers' an examination into the four prong test. While a short delay may be sufficient to warrant a scrutiny of the surrounding circumstances, a somewhat longer delay of 'substantial' length is necessary to 'trigger' the presumption of prejudice.

*Wilson & Green,* 34 Md. App. at 299 n.3 (citation omitted).

month delay was not substantial and, therefore, the presumption of prejudice did not arise, leaving the burden of proving prejudice on the defendant. *Id.* at 243.

We reach a similar conclusion here. In considering the approximate delay of 25 months in this case, there is an inherent possibility—especially given the nature of the crime in this case—that documents may have been lost and memory may have faded during the delay, and we take this into account. We also must keep in mind, however, that the only delay potentially attributable to the State was the 16 ½ months between the indictment and the arrest. As in *Lawless*, the delay in this case did not flow from bad-faith or inexcusable neglect, and the prejudice is not patent; instead, we concluded above that the State's pursuit of Appellant was made with reasonable diligence based on its uncertainty regarding Appellant's whereabouts. Because the State's actions were excusable and involved minimal negligence at worst, we do not consider the delay to be "substantial" so to give rise to a presumption of prejudice shifting the burden to the State. As the Supreme Court has stated, so long as the State acts with reasonable diligence, and absent any specific prejudice to the defense's case, a speedy trial claim fails "however great the delay." *Doggett*, 505 U.S. at 656.

Appellant attempted to submit an affidavit to show prejudice at the hearing on Appellant's motion to dismiss.[21] The State moved to strike Appellant's affidavit as "self-

---

[21] The affidavit included averments regarding Appellant's address during the relevant time frame; her faded memory of the events, conversations with counsel, and tasks taken as personal representative; as well as her inability to locate certain documents (continued . . .)

serving hearsay" and opposed the admissibility of the affidavit at the hearing because Appellant was not present to be cross-examined.[22] Appellant defended the admissibility of the affidavit on the ground that the substance of the first fourteen paragraphs are "of public record" and that the attached authenticated documents cannot be challenged on the grounds of accuracy and authenticity (i.e. the driver's license). Although the court declined to strike the affidavit from the pleading, as it is not improper to file affidavits with a pleading, the court refused to admit the affidavit into evidence as inadmissible hearsay.

On appeal, Appellant argues that the affidavit was admissible under the residual hearsay exception pursuant to Maryland Rule 5-803(b)(24), under which the availability of the declarant is not required. As highlighted by the State, this argument was not raised below. "[W]hen evidence is inadmissible on its face and admissible only for a limited purpose or under some theory, the proponent must also explain to the court how the evidence is admissible and why it should be received." *In re Adoption/Guardianship Nos. CAA 92-10852, 92-10853 in Circuit Court for Prince George's Cnty.*, 103 Md. App. 1, 33 (1994) (citing *Ali v. State,* 314 Md. 295, 305–07 (1988) and McLain, *Maryland Evidence,* § 103.17, 103.20 (1987)). Here, the affidavit constituted hearsay, and Appellant failed to

related to her work, such as handwritten notes, e-mails, word processing documents and spreadsheets relating to her work at Source Staffing.

[22] At the pre-trial hearing held on May 17, 2013, Appellant had waived her right to be present at the motions hearing in open court.

argue the residuary exception below. Appellant maintains, however, that although she did not explicitly cite the residuary exception, her arguments in favor of admissibility demonstrated substantive qualifications of the affidavit under that exception. This argument, however, would require circuit courts to ascertain whether arguments were relevant to the factors of the residuary exception, then *sua sponte* determine whether the residuary exception should be applied, absent such an argument by counsel, and then, as it must, engage in a detailed analysis on the record before admitting the evidence under that exception on its own volition. *See State v. Walker*, 345 Md. 293, 296 (2012) (explaining that a court must consider six conditions before admitting evidence under the residual exception). We decline to sanction this argument and impose such an obligation on trial courts. The court did not err in excluding the affidavit.

Based on the foregoing, and taking into account both the State's actions and the natural impact that passage of time has on a case, we accord the prejudice factor neutral weight.

### 5. Balancing

After balancing all of the facts and circumstances in accordance with the four *Barker* factors, we conclude that Appellant's right to a speedy trial was not violated. Although the delay totaled approximately 25 months, only 16 ½ of those months were potentially attributable to the State. The circuit court found that the State's inability to procure Appellant in that timeframe was largely due to her residence in Arizona and the apparent uncertainty surrounding Appellant's specific whereabouts in Arizona.

36

Weighing the particular circumstances of this case, namely a delay caused largely by the failure of the Maricopa County Sheriff's Office to serve the warrant in Arizona followed by Appellant's own efforts to fight extradition, coupled with the lack of demonstrated prejudice in this case, we conclude that the circuit court did not err in denying Appellant's motion to dismiss. As reflected above, the length of the delay, in the first of its two very distinct functions, was sufficient to trigger the full *Barker* analysis. Beyond that, balanced against the other three *Barker* factors, the delay did not weigh sufficiently in favor of Appellant, who, the record suggests, did not want a speedy trial as much as she wanted to be denied a speedy trial.

## II.

### *Territorial Jurisdiction*

> The murky bogs of criminal jurisdiction are ideal for the cultivation of Socratic dialogues but often perilous to the sound administration of justice.

*Wright v. State*, 339 Md. 399, 406 (1995) (Raker, J.).

Appellant challenges the circuit court's jurisdiction over the theft and embezzlement charges brought against her. Appellant argues that Maryland courts lack territorial jurisdiction over her alleged crimes because all of the elements comprising each offense occurred, if at all, in Arizona. Appellant rejects the "duty to account" theory of territorial jurisdiction, arguing that a personal representative of a Maryland estate is under no duty to account for real property located outside of Maryland (hereinafter "foreign real property") to the Maryland probate estate. Appellant further argues that

37

Maryland courts did not obtain jurisdiction on the ground that the alleged crimes may have impacted a Maryland resident. The State counters that Appellant did, in fact, have a duty to account for the proceeds of the sale of the Arizona property in Maryland and that Appellant had a duty, as personal representative, to the beneficiaries of the Maryland estate.[23]

Each circuit court in Maryland "has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal." Md. Code (1973, 2013 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP") § 1-501.

The Sixth Amendment to the United States Constitution, applicable to Maryland through the Fourteenth Amendment, provides that "in all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury of the State . . . wherein the crime shall have been committed." This provision founds the concept of "territorial jurisdiction," meaning "that only when an offense is committed within the boundaries of the court's jurisdictional geographic territory, which generally is within the boundaries of

---

[23] The State also argues that Appellant consented to personal jurisdiction in Maryland when she was appointed as a personal representative of a Maryland estate. We can dispose of this argument quickly, because submission to personal jurisdiction for purposes of being sued or involved in a civil action does not result in waiver of a State court's lack of territorial jurisdiction to prosecute a crime. As will be discussed *infra*, territorial jurisdiction concerns the State's power to prosecute and punish only those crimes within its borders–a factual issue that the State usually must prove beyond a reasonable doubt if disputed. *State v. Butler*, 353 Md. 67, 72-73 (1999).

the respective states, may the case be tried in that state." *State v. Butler*, 353 Md. 67, 72-73 (1999); *see also Bowen v. State*, 206 Md. 368, 375 (1955) ("[A]n offense against the laws of the State of Maryland is punishable only when committed within its territory. A person cannot be convicted here for crimes committed in another state." (citing *Worthington v. State*, 58 Md. 403, 409 (1882))).

Under certain circumstances, however, a person's actual presence in Maryland at the time the crime was committed is not required for this State to obtain jurisdiction. *State v. Cain*, 360 Md. 205, 212-13 (2000). "[T]he defendant's presence is not required in a court's territorial jurisdiction if, for instance, the intended result or an essential element of his or her crime lies in Maryland." *Butler*, 353 Md. at 74 (citations omitted). In the context of theft and embezzlement, actual presence is also not required to obtain territorial jurisdiction where the defendant was under a "duty to account" for the stolen or embezzled property in Maryland. *Wright*, 339 Md. at 406.

**Duty to Account Theory**

The Court of Appeals briefly visited the duty to account theory in *Urciolo v. State*, 272 Md. 607 (1974), in which an attorney in Washington, D.C. was convicted in Anne Arundel County Circuit Court for having feloniously embezzled money from his client in connection with a real estate settlement for a tract of land in Anne Arundel County. *Id.* at 608-09. The Court reversed the conviction, concluding that even if the duty to account theory was applicable in Maryland, the attorney's duty to account for the funds to be delivered to his client was not in Maryland, because the defendant's office was in

Washington, D.C. and the client resided in Arizona. *Id.* at 640; *see also Wright*, 339 Md. at 406 n.3 (interpreting *Urciolo* as indicating that the duty to account was in Arizona, where the client resided).

The Court of Appeals formally adopted and applied the "duty to account" theory of territorial jurisdiction in *Wright v. State*, 339 Md. 339, 406 (1995). In *Wright*, the defendant was employed by a Maryland trucking company and was tasked to drive a company vehicle to transport food items to and from various eastern states. *Id.* at 400. Throughout his itinerary, the defendant was required to report to the company twice daily. *Id.* Between one trip interval, however, the defendant failed to make the required delivery and failed to contact the company. *Id.* at 401. A few weeks later, the defendant contacted the company and claimed that his company vehicle had been hijacked. *Id.* The defendant was ultimately charged with theft as well as other offenses, and the defendant filed a motion to dismiss based on lack of territorial jurisdiction. *Id.* The circuit court denied this motion, and we affirmed. *Id.* at 401-02.

Following its grant of certiorari, the Court of Appeals recognized that, as a matter of common sense, jurisdiction would seem proper in Maryland, given that the company, the defendant, and the witnesses were all located in or residents of Maryland and given the low likelihood of another jurisdiction discovering the crime and prosecuting it. *Id.* at 402. However, the Court explained that jurisdiction must exist in the legal sense, making the determination of jurisdiction more complex. *Id.* To that end, the Court began by formally adopting the "duty to account" theory discussed in prior cases. *Id.* at 403.

Underpinning the theory are decisions in larceny after trust and embezzlement cases, because "both of these crimes involve the unlawful conversion of property after the defendant has lawfully acquired possession subject to a duty to deliver the property to or use it for the benefit of the property's owner or other rightful possessor." *Id.* (citations omitted). The duties present in these crimes underlie the theory of jurisdiction rooted in a duty to account. *Id.*

The Court identified two primary reasons for the "duty to account" theory: (1) where a defendant's "duty to account" in Maryland is an essential part of the crime, jurisdiction on this theory is a simple application of the general jurisdictional rule that some part of the crime occur in Maryland; and (2) without this method of jurisdiction, it may be impossible to ascertain the appropriate jurisdiction in which to prosecute an accused, as "larceny after trust and embezzlement occur primarily in the mind of the thief, when he or she decides to convert property that is already in his or her possession." *Id.* at 403-04. The Court concluded that the duty to account rationale applied to the facts before it:

> In this case, Wright was obliged to return the tractor-trailer to Wheatley Trucking in Dorchester County, Maryland; his failure to do so constituted an unauthorized exercise of control over the vehicle. . . . Moreover, this omission was the sole evidence of the crime; unless jurisdiction could rest on the failure to return the tractor-trailer, this prosecution might never have been brought anywhere.

*Id.* at 405. Accordingly, the Court held that "jurisdiction over a theft offense exists in this state if the defendant was subject to a duty to account for the property within this

state" and, therefore, Maryland properly had jurisdiction to prosecute. *Id.* at 406. The Court clarified, however, that "[t]he duty to account will sustain jurisdiction only where such a duty is an essential component of a crime." *Id.* at 406. The Court contrasted the case from a simple theft case where "a person who lacks authority to take possession of certain property can consummate a theft merely by acquiring possession; in such a case, there is no duty to account, and jurisdiction cannot be founded on that basis." *Id.*

In the case *sub judice*, the parties do not dispute that Appellant was not present in Maryland at the time these crimes occurred; instead, they dispute whether Appellant had a duty to account for Ms. Lynch's Arizona property and the proceeds from the sale of that property in Maryland. A court's determination of whether a duty to account existed in this case is a legal issue, and therefore we review the circuit court's determination that duty to account in Maryland existed de novo.[24]

   i.   *Maryland Estate Administration*

Under Maryland law, a personal representative is a fiduciary who "is under a

---

[24] Generally, when a defendant challenges a Maryland circuit court's territorial jurisdiction and the evidence generates a genuine dispute of fact regarding where the crime occurred, the court must submit the issue of territorial jurisdiction to the trier of fact, and the State must prove territorial jurisdiction beyond a reasonable doubt. *Butler*, 353 Md. at 83-84. Where, however, the evidence is insufficient to generate a factual dispute, the issue should not be submitted to the jury, but instead should be resolved by the court. *West v. State*, 369 Md. 150, 157 (2002) (holding that the undisputed evidence demonstrated as a matter of law that the court lacked territorial jurisdiction over the charges and therefore should not have been submitted to the jury). Here, there is no dispute of fact regarding where the crime occurred; instead, the dispute centers on whether, under the laws of Maryland, Appellant had a duty to account to Maryland.

general duty to settle and distribute the estate of the decedent in accordance with the terms of the will and the estates of decedents law[.]" Maryland Code (1974, 2011 Repl. Vol.), Estates and Trusts Article ("E.T.") § 7-101(a). In exercising his or her duty to act in the best interests of the estate, the personal representative "is obligated to exhibit the following qualities": (1) "The exercise of care, skill and diligence of a reasonably prudent person dealing with his or her own property;" (2) "The exercise of good faith and loyalty to all the beneficiaries;" (3) "The lack of self-dealing;" (4) "The exercise of reasonable watchfulness over investments; and" (5) "The maintenance of full, accurate and precise records." *Beyer v. Morgan State Univ.*, 369 Md. 335, 351 (2002) (citing *Kann v. Kann*, 344 Md. 689, 708 (1997)).

One of a personal representative's first tasks following appointment is to prepare and file an inventory with the Register of Wills within three months. E.T. § 7-201. An inventory—serving to inform and to value assets subject to inheritance tax, Maryland Code (1997), art. 93, § 7-201 cmt.—must list the "property owned by a decedent at the time of his death" with reasonably descriptive detail, including the items' appraisal values. E.T. §§ 7-201, -202. The Estates and Trusts Article defines "property" as "all real and personal property of the decedent" as well as any right or interest therein, *see* E.T. § 1-101(r), and the inventory statute explicitly requires real property to be listed in an inventory. E.T. § 7-201(1). The personal representative must also file an information report pursuant to Rule 6-404 within three months. Unlike an inventory, the information report is not the first step to assessment, but "is the procedure whereby the register is

advised of the existence of nonprobate assets subject to tax, so that if the assessment process is not otherwise commenced, the register will have sufficient information upon which to act." Alan J. Gibber, *Gibber on Estate Administration* § 5.37, at 5-48 (5th ed. 2008, 2013).

The State maintains that the Arizona property should have been identified in the inventory. Because the statute defining "property" and the statute governing the filing of an inventory do not mention the situs of real property, it would appear, at first blush, that a personal representative must account for both Maryland real property and foreign real property in the inventory.[25] We do not read the statute so broadly.

The definition of "property" in the Estates and Trusts Article, as explained in the comment to former art. 93, § 1-101, ". . . is intended to include, *and be limited to,* those assets which have traditionally constituted what is sometimes called in Maryland the 'probate estate[.]'" The commentary does not reference out-of-state real property. Yet, Maryland courts are clear that, by its definition, "foreign" real property is not in Maryland and therefore cannot be subject to the powers and laws of this State. *See Roach v. Jurchak*, 182 Md. 646, 649 (1944) ("It is a universal principle of the common law that the formalities necessary for transfer of real estate . . . are governed by the lex

---

[25] Indeed, in a 1983 opinion of this Court, we concluded, in the context of determining whether a caveat could be made to a decedent's will, that the evidence, if believed, demonstrated that the personal representative in that case committed a "material mistake" or "substantial irregularity" by failing to prepare and file an inventory within three months of his appointment that identified the decedent's property in Washington, D.C. as an asset of the estate. *See Pellegrino v. Maloof*, 56 Md. App. 338, 349 (1983).

44

loci rei sitae, irrespective of the lex domicilii. . . . It is manifest that the courts of a State cannot affect persons and things beyond their jurisdiction." (citations omitted)); *see also* Gibber, *supra,* § 2.5, at 2-8 (providing that foreign real property is considered a "nonprobate" asset of a Maryland estate); Gibber, *supra,* § 4.1, at 4-1. Thus, although the statutes providing for an inventory and the corresponding definition of "property" do not distinguish between real property located in Maryland and foreign real property, our courts have unequivocally accepted the principle that foreign real property cannot be subject to Maryland law.

Moreover, the Rules Committee, at its hearing held on September 5, 1997 for the amendment to Rule 6-404 governing the information report, addressed the practice of treating foreign real property as a nonprobate asset. The Reporter's Note to that hearing reflects that Alan J. Gibber, Esq., a Maryland estate practitioner, testified about existing confusion regarding where to report foreign real property, given that it is not a Maryland probate asset. *Minutes of the Court of Appeals Standing Committee on Rules of Practice and Procedure,* 105-06 (Sept. 9, 1997) [hereinafter *1997 Committee Minutes*]. The Minutes reveal suggestions that were made regarding how to resolve this confusion:

> One suggestion was to put [the foreign real property] in the inventory form, but since foreign property does not have to be valued as part of the probate process, placing this on the inventory form was too confusing. The Subcommittee decided to put the question about the decedent's foreign real property on the Information Report.

*1997 Committee Minutes, supra,* at 106. In his treatise, Mr. Gibber explained:

> The purpose of this change was to clarify that such foreign real property should not be listed in the Inventory, and that an appraisal, or even a statement of value, was not required. The listing of the interest is to provide notice to interested persons of the existence and whereabouts of such foreign property, leaving it up to the interested persons to follow through as desired.

Gibber, *supra*, § 5.39, at 5-49. Thus, Rule 6-404 now requires identification on the information report of the decedent's "interest in any real or leasehold property located outside of Maryland either in the decedent's own name or as a tenant in common[,]" including the location of the property and the "Case Number, Names, and Location of Court Where Any Court Proceeding Has Been Initiated With Reference to the Property[.]" Therefore, based on the foregoing, it is the practice in Maryland that foreign real property does not need to be included in an inventory for purposes of inclusion in the Maryland probate estate; however, it must be on the information report.

After filing the inventory and information report, the personal representative has an ongoing "duty to account." This requires the representative to "file written accounts of his [or her] management and distribution of property at the times and in the manner prescribed in th[e] subtitle, with a certification that he has mailed or delivered a notice of the filing to all interested persons." E.T. § 7-301. Maryland Rule 6-417 governs what must be included in the accounting, such as the total value of the property as shown on the inventory, expenses of administration, and the total gross value of the estate's assets

to be accounted for. Expenses of administration include costs incurred during the sale of property, which are chargeable to the estate.[26] Gibber, *supra*, § 6.8, at 6-9.

A personal representative for a Maryland decedent owning real property in another state, like Arizona, must abide by the laws of the state in which the real property is located relating to the sale and transfer of that property. *See* Arizona Revised Statutes Annotated § 14-1301(2) (establishing that Arizona law applies to "[t]he property of nonresidents located in this state or property coming into the control of a fiduciary who is subject to the laws of this state"). Yet, even though Arizona law governs the sale and transfer of the property, the following question remains: to which State did Appellant have a duty to account for the *proceeds* of the sale of that real property? Appellant was convicted of embezzling and stealing the proceeds, not the property itself.[27] Maryland

---

[26] Notably, here, the Maryland estate ultimately paid for the expenses relating to the Arizona property, which amounted to $11,480.39.

[27] We clarify that the distinction we draw between the real estate itself and the proceeds from the sale of the real estate is solely drawn for the purposes of determining where a personal representative is required to report those proceeds. Indeed, our courts have rejected the distinction for purposes of inheritance tax law. In *State v. Fusting*, 134 Md. 349, 354 (1919), the Court of Appeals rejected an argument that the sale of foreign real estate pursuant to the dictates of a Maryland decedent results in "equitable conversion" of the real property to personal property (the proceeds) and thus the proceeds, as personal property, are subject to Maryland inheritance tax. "Neither [the foreign real estate] nor the money realized from its sale is taxable under the law of this state." *Id.* "[I]t is only upon the transmission to collateral relatives of property situated in this state of which the deceased dies seized and possessed that the tax is imposed[.]" *Id.* at 352.

law contemplates including the proceeds from the sale of foreign property in the estate administration account in certain circumstances:

> It has long been the practice that when a personal representative brings the proceeds from the sale of [f]oreign real property and tangible personal property permanently located out of Maryland into the Maryland estate:
>     1. The proceeds may be accounted for on the Administration Account of the Maryland estate.
>     2. Maryland Inheritance tax is not due on the distribution of the proceeds.

Gibber, *supra*, § 2.5(u), at 2-8 (emphasis added) (citing 25 Op. Att'y Gen. 599 (1940); 21 Op. Att'y Gen. 787 (1936)).

Whether Appellant had a duty to account for the proceeds of the sale of the Arizona property in Maryland or Arizona brings us to the concept of "ancillary administration." An ancillary probate proceeding is an estate "administration that is auxiliary to the administration at the place of the decedent's domicile, such as one in another state[,]" and "[t]he purpose of this process is to collect assets, to transfer and record changed title to real property located there, and to pay any debts in that locality" Black's Law Dictionary 52 (10th ed. 2014). When initiating an ancillary administration, the personal representative must seek ancillary letters of administration from the state in which the foreign property is located; as a result, even if the domiciliary and ancillary administrator are the same person, he is considered to have "received his authority from two distinct sovereignties, and has received different property for which he is separately accountable according to the tenor of his several appointments." *Baker v. Cooper*, 166 Md. 1, 8 (1934).

*ii.*     *Arizona Law*

Appellant seems to believe that all actions taken by a personal representative in another state constitute "ancillary proceedings." Ancillary administration—an often costly and time consuming method—is not, however, required in every state to handle property situated in that state. Notably for the instant appeal, and contrary to Appellant's assumptions, one such state is Arizona, which has adopted the Uniform Probate Code—a uniform law designed, in part, to simplify and unify multi-state administrations and "to avoid conflicting fiduciaries[.]" *See* 1 *Uniform Probate Code Practice Manual* 432, 446 (2d ed. 1977). Arizona provides a foreign personal representative with several options to initiate handling a nonresident decedent's property located in that State: he or she "may **either** collect the property by affidavit, file proof of authority with an Arizona court, **or** open an ancillary administration."[28]   12 *Ariz. Prac., Estate Planning & Probate Handbook* § 5:1 (2013) [hereinafter *Arizona Probate Handbook*] (emphasis added). The latter two options are most relevant in the instant case.

Regarding proof of authority, Arizona law permits a domiciliary foreign personal representative to "file with a court in [Arizona] in a county in which property belonging to the decedent is located certified copies of the appointment [in the foreign jurisdiction] and of any official bond that has been given" so long as no local administration,

---

[28] The affidavit option is available for foreign personal representatives who are handling a nonresident decedent's estate involving *personal* property and is therefore not relevant in this case. *See* A.R.S. § 14-4201.

application, or petition is pending in Arizona. A.R.S. § 14-4204; *see also* A.R.S. § 14-4206 (reiterating that the power of the domiciliary foreign personal representative may only be exercised "only if there is no administration or application therefore pending" in Arizona). Upon doing so, the domiciliary foreign personal representative "may exercise as to assets in th[e] state [of Arizona] all powers of a local personal representative and may maintain actions and proceedings in this state subject to any conditions imposed upon nonresident parties generally." A.R.S. § 14-4205. Notably, however, *no probate or administration is opened upon the filing of proof of authority*. Indeed, Arizona's Practice Series Estate Planning and Probate Handbook explains that "[w]here the nonresident decedent owned real property in Arizona, a foreign personal representative *not wanting to open an ancillary probate and appointment proceeding* may simply exercise their powers in Arizona after filing proof of authority with the appropriate Arizona court." *Arizona Probate Handbook* § 5:1 (emphasis added).

Alternatively, a foreign personal representative could open an ancillary proceeding. A.R.S. § 14-207. In that case, the proceedings commenced for the probate of a will and appointment of a personal representative as well as the status, powers, duties, and liabilities of the local personal representative would be governed by chapter three of Title 14 of the Arizona Code. *Id.* Such a proceeding may be desirable "if the foreign personal representative is concerned about local creditor claims[,]" which may make the "efficiency and structure of the claim presentation process" of an ancillary proceeding desirable. *Arizona Probate Handbook* § 5:1. In such a scenario, Arizona law

50

requires that any excess be distributed to the domiciliary representative, absent any

applicable exceptions:

> The estate of a nonresident decedent being administered by a personal
> representative appointed in this state shall, if there is a personal
> representative of the decedent's domicile willing to receive it, be distributed
> to the domiciliary personal representative for the benefit of the successors
> of the decedent unless any of the following apply:
> > 1. By virtue of the decedent's will, if any, and applicable choice of
> > law rules, the successors are identified pursuant to the local law of
> > this state without reference to the local law of the decedent's
> > domicile.
> > 2. The personal representative of this state, after reasonable inquiry,
> > is unaware of the existence or identity of a domiciliary personal
> > representative.
> > 3. The court orders otherwise in a proceeding for a closing order . . .
> > or incident to the closing of a supervised administration. In other
> > cases, distribution of the estate of a decedent shall be made in
> > accordance with the other articles of this chapter.

A.R.S. § 14-3816; *see also Restatement (Second) of Conflict of Laws* § 364 (1971) ("A

court of ancillary administration will, after payment of claims, exercise its discretion as to

the disposition of the balance of the local personal estate [including proceeds of the sale

of land]; it may order its executor or administrator to transmit the balance of the personal

estate to the court of administration at the domicil[e] of the decedent; it may order him

without such transmission to distribute the balance to the persons who are entitled to it; or

it may order him to transmit part and distribute the rest."); 31 Am. Jur. 2d *Executors and

Administrators* § 1058 (2015) ("Generally, after all claims filed and allowed in the

ancillary administration have been paid, any surplus remaining should normally be

remitted to the domiciliary representative for final settlement and distribution."

(footnotes omitted)). Commentary to the Uniform Probate Code provides that this provision is intended to "reflect[] the unity concept" of the Code. *Uniform Probate Code Practice Manual*, *supra,* at 441.

In the instant case, the record reflects that Appellant filed a "proof of authority" in the Superior Court of the State of Arizona in and for the County of Maricopa, attaching the Letters of Administration issued by the State of Maryland for the probate administration of Ms. Lynch's will.[29] Thus, in lieu of opening an ancillary proceeding and being appointed as personal representative by an Arizona court, Appellant acted on behalf of Ms. Lynch's estate in Arizona under the cloak of authority bestowed by the State of Maryland. In other words, she was enabled by one sovereign, Maryland, to take actions on behalf of the estate, which the State of Arizona accepted on principle of comity. This Court has not identified, nor have the parties directed us to, any obligation in this case to account for the proceeds in Arizona based on the facts of this case. Interestingly, had Appellant opened an ancillary proceeding (which she was not required to do), she likely would have been required under Arizona law to remit the sale proceeds to Mr. Terry as the domiciliary personal representative for proper distribution in Maryland. *See* A.R.S. § 14-3816. Again, the rationale behind transferring the remaining

---

[29] As highlighted *supra*, Mr. Newcomer testified that he requested a full copy of all the files that Appellant filed in the Arizona court, and the copy of the file that he received was admitted into evidence as State's Exhibit 14, which included only the Proof of Authority, State of Maryland Letters of Administration, and a notification of Appellant's resignation as personal representative. As highlighted by the State in closing, no accounting of the sale and its proceeds was in the file received from the court.

proceeds back to the domiciliary estate, here, Maryland, is to unify the administration, not to encourage two independent dispositions (absent exceptional circumstances).

Accordingly, we conclude that the instant case presents an appropriate scenario in which to apply the principles espoused in *Wright v. State*. First, *Wright* established that a defendant's "duty to account" for the property is an essential element for crimes like embezzlement, and here, Appellant was charged with the crimes of embezzlement as a fiduciary and theft. The "duty to account" for the proceeds of the sale of the Arizona property was an essential part of the embezzlement charge in this case. Appellant lawfully acquired the proceeds by virtue of her appointment as personal representative by a *Maryland* court of a Maryland estate and was therefore subject to a duty to account for those proceeds and distribute them to the beneficiaries of Ms. Lynch's will.

Second, *Wright* established that the need for jurisdiction under the duty to account theory is necessary where it may otherwise be impossible to ascertain the appropriate jurisdiction in which to prosecute the accused, and thus the accused may go unpunished. Here, Appellant exercised her powers as personal representative by filing proof of authority (namely, her Maryland letters of administration) in lieu of opening an ancillary proceeding in Arizona, and thus Appellant had no duty to account for the proceeds or report any of her actions to an Arizona court. As a result, that duty remained in Maryland. Appellant maintains that because Maryland probate law fails to explicitly require that the inventory and account include foreign property or the proceeds from the sale therefrom, no duty to account could lie in Maryland. We reject the logic of this

reasoning. Adopting such a rationale would mean that Appellant had no duty to account for the proceeds in any state at all. Such an outcome would run afoul to the concept of a *fiduciary*'s role in probate administration entirely, leaving the personal representative as the sole governor of who gets what property and funds without any accountability.

Therefore, we hold that the Circuit Court of Montgomery County did not err in concluding that it had territorial jurisdiction to prosecute the crimes alleged against Appellant pursuant to the "duty to account theory" adopted by the Court of Appeals in *Wright*.

## III.

### *Expert Testimony*

Last, Appellant contends that the circuit court erred in permitting the testimony of Linda Hawkins, the Deputy Register of Wills, on four grounds: that the testimony (1) constituted impermissible legal testimony; (2) constituted an impermissible expert opinion under the guise of a lay person's testimony; (3) was irrelevant; and (4) was unduly prejudicial. The State counters that these objections have been waived because Appellant failed to object in a timely manner. Even if she did lodge a timely objection, the State continues, her claims nevertheless have no merit, because the statements were simply confirmation of the duties of the Register of Wills and were relevant to the State's theory of jurisdiction.

At trial, Ms. Hawkins testified that she was the Chief Deputy of the Register of Wills in Montgomery County, where she has worked for 28 years. In this capacity, she

became familiar with Ms. Lynch's estate, and determined that expenses in the amount of $33,243.35 were deducted from the Maryland estate to cover the costs relating to the Arizona property. When the State asked Ms. Hawkins about the significance of that amount, Ms. Hawkins responded, "Well, they're paid from the Maryland estate for a property that's in Arizona, and Maryland allows you to do that if, in fact, there is no money in Arizona to pay for those expenses." Defense counsel objected and requested to approach the bench. As a basis for his objection, defense counsel asserted:

> That last was an opinion as to what Maryland allows you to do, and I believe that [the State] intends to elicit further opinions from this witness. This witness was not designated as an expert, and moreover, even if she had been – and we were advised that there would be no experts for the State. Even if she had been, what I think she just testified to as conclusions of law as to what Maryland probate allows. And finally, I think it's particularly inappropriate for her to be testifying to conclusions of the law since she is the head of the whole operation. . . .

The court resolved it would "tell the jury that the last part of the answer about whatever Maryland law is not to be considered by them. She can talk about what's in the file and what auditors do and whatnot." The court then instructed:

> All right, so just – members of the jury, so Ms. Hawkins is here as the Chief Deputy of the Register of Wills and she'll be testifying about the file and the contents of the file and what her office does and the auditing procedures and whatnot. So the last part of that about what Maryland law permits I'll simply strike from the record. . . . .

The following colloquy then occurred:

> [STATE]:. . . . [W]hy does an auditor look to see whether or not expenses have been used to pay for an out-of-state property?

55

[MS. HAWKINS]: Because – well, are you going to object if I say it again? Because we have to make sure that the expenses are legitimate expenses in the estate, and if it's an out-of-state piece of real property, we don't even bring the real property into the estate in a normal case. And so we have to look to see if the expenses are related to real property that may not be sold or – and if they are not – if the real property is not sold, then they are legitimate expenses of the Maryland estate. And if it is sold, it's a whole different – he's going to object.

[DEFENSE COUNSEL]: Objection. Move to strike the last portion.

[THE COURT]:     Overruled.

\*     \*     \*

[STATE]:     Okay. With regard – you know, you said if it – if it is sold, that's a whole other ballgame.

[MS. HAWKINS]: Uh-huh, right.

[STATE]: Well, what is that ballgame that you're talking about?

[MS. HAWKINS]: If the property is sold, then we require them to bring the property in to [sic] the estate to offset those expenses, especially in a taxable estate because we are a taxing agency and we will then tax the expenses.

[DEFENSE COUNSEL]:   Objection. Same objection, and move to strike.

[THE COURT]: All right. Overruled.

Before December of 2012, Ms. Hawkins did not notice whether a report of the sale of the Arizona property was in the file. During cross-examination, when defense counsel asked Ms. Hawkins if she believed that Gibber on Estate Administration was "definitive" on Maryland estate law, the court sustained the State's objection, stating "what she was permitted to do was talk about what they do in their office."

56

As a threshold matter, the State argues that Appellant's objections to Ms. Hawkins's testimony were untimely and thereby waived. The State asserts that Appellant failed to object when an objectionable question was asked and, instead, waited to lodge an objection until *after* Ms. Hawkins answered. Appellant, on the other hand, maintains that the questions themselves were not objectionable and that her trial counsel acted with diligence in promptly objecting when the objectionable testimony became evident.

"Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record. . . ." Maryland Rule 5-103(a)(1). Maryland Rule 4-323(a) requires parties to make objection "at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent"; otherwise, the objection is waived. The Court of Appeals has further explained:

> Therefore, "[i]f opposing counsel's question is formed improperly or calls for an inadmissible answer, counsel must object immediately. Counsel cannot wait to see whether the answer is favorable before deciding whether to object." 5 L. McLain, *Maryland Evidence* § 103.3, at 17 (1987); *Moxley v. State,* 205 Md. 507, 515, 109 A.2d 370, 373 (1954).
>
> The strict rule that an objection made at an inappropriate time will waive the objection, however, will give way when "**the question is unobjectionable, but the answer includes inadmissible testimony which was unforeseeable from the question.**" 5 L. McLain, *Maryland Evidence* § 103.3, at 18; *Moxley,* 205 Md. at 515, 109 A.2d at 373; *see also Klecka v. State,* 149 Md. 128, 132, 131 A. 29, 30 (1925) (objection need not be made before answer if " 'the inadmissibility was due not to the subject of the question, but to some feature of the answer.' "). In these circumstances, objecting counsel may move to strike the witness's response immediately after the grounds for objection have become apparent, as Rule 4–323(a) provides.

*Bruce v. State*, 328 Md. 594, 627-28 (1992) (emphasis added). We disagree with the State that the first objected-to question—"[W]hy does an auditor look to see whether or not expenses have been used to pay for an out-of-state property?"—was patently objectionable, because an answer to that question would not necessarily be inadmissible. This is evidenced by defense counsel's objection only to the last portion of her answer, not the entire answer, suggesting that counsel objected as soon as he ascertained improper testimony regarding what happens when out-of-state property is sold. The second line of questioning—regarding "if [the property] is sold, that's a whole other ballgame" and "what is that ballgame that you're talking about?"—arguably should have alerted defense counsel of the foreseeable objectionable answer: the treatment of real property versus the proceeds from the sale of real property. Yet, "there is no bright-line rule to determine when an objection should be made[,]" but "the objection must come quickly enough to allow the trial court to prevent mistakes or cure them in real time[.]" *Prince v. State*, 216 Md. App. 178, 194 (citations omitted), *cert. denied,* 438 Md. 741 (2014). We are satisfied that defense counsel did not lack diligence and "sit back" and allow the State to establish its case until it was too late; he objected promptly enough to the very brief answer, giving the court the opportunity to correct the error in real time, if warranted, and timely moved to strike before the next question was asked. This contrasts, for example, a case where counsel did not object to an objectionable line of questioning for some time and then later objected. *See, e.g., Prince*, 216 Md. App. at 194-95.

58

Turning to the merits, Appellant first argues that Ms. Hawkins's testimony amounted to inadmissible testimony as to what the law requires. Generally, witnesses cannot provide testimony presenting a legal conclusion, although an expert may be permitted to testify about another jurisdiction's law. *See Solomon v. State Bd. of Physician Quality Assur.*, 155 Md. App. 687 (2003), *cert. denied*, 381 Md. 676 (2004); *see also Franceschina v. Hope*, 267 Md. 632, 643 (1973) (noting that, although a witness may express an opinion on ultimate facts, "'this does not mean that the witness may in the guise of opinion upon a matter of fact include in it a matter of law or the application of a rule of law to the facts.'" (quoting Edmund M. Morgan, *Basic Problems of Evidence*, at 218 (1962))). We are unpersuaded that Ms. Hawkins testified to a matter of law. She did not provide her understanding of Maryland law or an explication as to what Maryland law requires, nor did she apply any law to the facts of this case. Instead, the circuit court found, and we agree, that she testified as to the responsibilities of and procedures followed by the Register of Wills. That those duties and processes may have derived from Maryland law does not render her testimony an inadmissible *legal* testimony as to what the law required. This challenge is better characterized as improper expert testimony, which is what Appellant urges next.

Appellant asserts that Ms. Hawkins's testimony constituted "inadmissible expert opinion presented under the guise of lay testimony." We review a circuit court's ruling on the admissibility of lay testimony for an abuse of discretion. *Prince, supra,* 216 Md. App. at 198. "[T]he decision as to whether to require a witness to testify as an expert 'is

59

a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.'" *Id.* (internal quotation marks omitted) (quoting *Oken v. State,* 327 Md. 628, 659 (1992)). "'[A]buse of discretion occurs where no reasonable person would take the view adopted by the [trial] court or when the court acts without reference to any guiding rules or principles.'" *Henson v. State*, 212 Md. App. 314, 325 (quoting *Hajireen v. State,* 203 Md. App. 537, 552 (2012)), *cert. denied,* 434 Md. 314 (2013).

> Maryland Rule 5-701 governs the admissibility of lay testimony:
>
> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

On the other end of the spectrum, Rule 5-702 governs the admissibility of expert testimony:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

The Court of Appeals has held that these two rules, together, "prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education[;]" otherwise, "parties may avoid the notice and discovery requirements of our rules and blur the distinction between the two rules." *Ragland v. State*, 385 Md. 706,

725 (2005). In other words, Maryland courts have adopted the narrow approach that "lay witnesses may testify regarding their direct perceptions of events but that opinions or inferences that rely on scientific, technical, or specialized knowledge must be excluded unless the witness is qualified as an expert." *Id.* at 721.

Appellant argues that Ms. Hawkins's testimony about the policies of the Register of Wills was based on her experience, understanding of Maryland law, and legal advice from the Attorney General's Office and therefore fell within "the testimonial province of experts." We agree with Appellant that Ms. Hawkins's testimony was premised on specialized knowledge, training, and experience by virtue of her role as Deputy Register of Wills, because she gave substantive explanation as to why the office treats property and the proceeds from the sale of property differently. This explanation regarding *why* the Register of Wills requires the proceeds from the sale of foreign real property to be brought into a Maryland estate for the purpose of offsetting expenses exits the realm of layperson testimony as to direct perception of events and tasks and enters the realm of expert testimony based on specialized knowledge of probate law, an area of which the average layperson has no knowledge. Therefore, under the principles set forth in *Ragland*, the court erred in permitting Ms. Hawkins to testify absent qualification as an expert witness.[30]

---

[30] We note, however, that Ms. Hawkins likely could have been admitted as an expert in this area given her experience, if the State had properly named her as an expert witness during discovery pursuant to Maryland Rule 4-263(d).

However, we conclude that this error was harmless beyond a reasonable doubt. The oft-cited explanation of harmless error was stated by the Court of Appeals in *Dorsey v. State*, 276 Md. 638, 659 (1976):

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. **Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed to the rendition of the guilty verdict.**

(Emphasis added). Here, as Appellant even admits in her brief, Ms. Hawkins's testimony was irrelevant to her convictions for theft and embezzlement, as it did not tend to prove any element of either crime. *See Fullbright v. State*, 168 Md. App. 168, 182 (rejecting the appellant's argument that the circuit court abused its discretion in admitting an officer's lay testimony without qualifying him as an expert because, *inter alia,* the officer's "opinion regarding the quality of latent fingerprints from wet objects was not introduced to prove an essential element of the offenses for which appellant was charged" but "rather was directed to the issue of the adequacy of the police investigation"), *cert. denied*, 393 Md. 477 (2006). Moreover, Ms. Hawkins's irrelevant testimony did not prejudice Appellant by contributing to the guilty verdict.

Ms. Hawkins's testimony, at most, suggested to the jury that there was an obligation to return the proceeds to the Maryland estate, which was largely relevant to the State's theory of jurisdiction, not to the elements of the charged offenses. Appellant

62

argues that the testimony may have prompted the jurors to "disregard the evidence" and improperly substitute the obligation and failure to satisfy that obligation as evidence of her intent to commit the crime. At trial, however, it was undisputed that Appellant failed to comply with her duty to properly handle the proceeds and ultimately disburse them to the beneficiaries of Ms. Lynch's will. The only factual issue in dispute was Appellant's *intent* in doing so—did she act knowingly and willfully to deprive and appropriate, or did she make an innocent mistake? Indeed, defense counsel argued in closing that the instant case was not a "what happened" case, but a "why did this happen" case. The defense theory was that Appellant trusted her estate counsel regarding her obligations; that, as a layperson, she did not know any further responsibilities were required of her; and that she believed she was entitled to some of those funds to compensate her work as a personal representative. Therefore, Ms. Hawkins's testimony that an obligation existed to return the proceeds to Maryland pursuant as part of the administration of the estate did not support an inference that Appellant failed to satisfy that obligation intentionally and willfully in order to steal and embezzle. Instead, Ms. Hawkins's testimony was only relevant to the State's theory of jurisdiction—a question of law—on the ground that the proceeds should have been brought into the estate.[31]

Moreover, on the issue of intent, there was evidence in the record to support the jury's finding of guilt. The evidence and testimony reflected that Appellant opened a

---

[31] We note that the court resolved the jurisdictional issue via Appellant's motion for acquittal at the close of all evidence, so during trial, the question was still unresolved.

bank account separate from the other estate accounts before selling the Arizona property; that she did not tell Mr. Terry or all the beneficiaries that she sold the property; that she was the only person entitled to handle the proceeds in the account; that she distributed *some* of the proceeds to certain, but not all, entitled beneficiaries, supporting the inference that she knew she should not keep all of the proceeds; that she kept most of those proceeds for herself; that she emptied the account following deposit of the proceeds in just nine days following deposit; and that she resigned as personal representative soon after. Moreover, Ms. Hawkins properly testified, without objection, that a report of the sale was not in the Maryland estate file, and the complete Arizona court file admitted into evidence also did not include an accounting of the sale of the property or relevant distributions to beneficiaries. In addition, regarding motive, Mr. Newcomer testified that Appellant's home was pending in foreclosure in January 2011, the month following her emptying of the proceeds account, and that she purchased a new home within 15 days after the sale of the house via an all-cash purchase.

Based on the foregoing, we conclude that any error in the admission of Ms. Hawkins's testimony regarding the obligation to return proceeds to the Maryland account to cover expenses related to that property was harmless because that testimony was relevant to the legal duty to account, not to the facts before the jury regarding whether Appellant intended to commit theft and embezzlement.

**JUDGMENTS AFFIRMED;**
**COSTS ASSESSED TO APPELLANT.**